**JESÚS  R. ROMO VÉJAR**
**Attorney at Law**
**177 N. Church Avenue, Suite 200**
**Tucson, Arizona 85701**
**Telephone No (520) 628-7777**
**Facsimile     (520) 798-1980**
**Email: roescritor@aol.com**
**Attorney for Plaintiffs**

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| **Armando Nieves Martinez, et. al.** ) | **Case No. 13-955 TUC-LAB** |
| ) | |
| **Plaintiffs,** ) | **PLAINTIFFS STATEMENT OF FACTS** |
| **vs.** ) | **RE: DEFENDANT'S RESPONSE TO** |
| ) | **MOTION FOR SUMMARY JUDGMENT** |
| **The United States of America,** ) | |
| ) | |
| **Defendant.** ) | |
| _____) | |

1.     On August 18, 2011,  (August 18) Armando Nieves, his wife, and two teen-age children left Caborca, Sonora, around 6 a.m; on arrival at Lukeville, Arizona, Mr. Nieves and his daughter obtained a visa to go pass the 60 mile limit.  His wife and son did not require them. *See Exhibit 1, Deposition of Mr. Armando Nieves Martinez* at P. 9:5-10 and P. 13-3.

2.     Mr. Nieves has been a farmer in the City of Caborca, Sonora, Mexico for over 25 years.  His annual gross income is around three million dollars from grown, processing and exporting grape raisins in Caborca. *See Exhibit 1.* at P. 7:1-17.

3.     Before the August 18, 2011 incident he and his family visited the United States five or six times per year for family outings, business and shopping. *See Exhibit 1,* at Pp. 7:22-25, 8:1-6.

4.     He would generally visit Nogales, Tucson and Chandler.  *Id.* at P. 8:7-14.

5.      The day before the trip, Mr. Nieves picked up the truck used for trip from a shop where it had been in repairs for about ten days due to an accident his wife had suffered.  Part of the front of the trucks body had been damaged. *Id.* at P. 9: 21-25, 10:1-23.

6.      On August 18, 2011, The Nieves family planned to shop in Chandler and return to Caborca the following day. *Id.* at P.12: 2-8.

7.       The family had made reservations at the Windmill Inn in Chandler. *Exhibit 2, Deposition of Amelia Pesquera Ortega,* at P.23:1-2.

8.      For the trip, Mr. Nieves brought $3,000 dollars; used $1,500 savings and he cashed $1,500 dollars in pesos, day before the trip, at the local bank, and then changed the money for dollars at *Liberty* exchange in Caborca. *Exhibit 1, Deposition of Armando Nieves,* at P.13: 17-25, 14:1-23; *Exhibit 2, Deposition of Amelia Pesquera Ortega,*at P.23:3-8.

9.      The Nieves proceeded through the first checkpoint with no problems and upon arrival at the second checkpoint, the agent in charge told the family to "park on the side because the dog was getting nervous."  *Exhibit 1, Deposition of Armando Nieves,* at P.17: 11-15. and P. 19:7-8.

10.     After parking on the side of the road, the family was told to exit the car and Mr. Nieves was separated from the rest of his family.  *Exhibit 1, Deposition of Armando Nieves,* at P.19:18-20, and P. 22:6-9.

11.     An Border Patrol named Victor arrived and started questioning Mr. Nieves, placed him in handcuffs and put him in the back of a border patrol car. *Exhibit 1, Deposition of Armando Nieves*, P. 23:8:25, and 24:1-20.

12.     The rest of the family was placed at a motor home with bars. *Exhibit 2, Deposition of Amelia Pesqueira Ortega,* at P.6:12-25 and 7:1-5.

13.     Mr. Nieves felt in imminent fear of a physical attack because Victor was shouting and accusing him and all Mexicans of being drug traffickers and he was handcuffed and felt that after the shouting comes the hitting. *Exhibit 1, Deposition of Armando Nieves Martinez,* at P. 25:1-25, and 26:1.

14.     After the shouting, he observed his family being transported from the mobile home. *Exhibit 1, Deposition of Armando Nieves Martinez,* at P. 26:6-23.

15.     Fifteen to twenty minutes later he was taken to the same place her family was, at the Ajo Border Patrol station.  *Exhibit 1, Deposition of Armando Nieves Martinez,* at P. 26:6-8.

16.     There Mr. Nieves is placed in a windowless cell for about two hours; Victor came in and out of the cell continuing shouting at Mr. Nieves and continuing with using foul language, stating that Mr. Nieves knew that his car has drugs because they have been seen them through X rays.   *Exhibit 1, Deposition of Armando Nieves Martinez,* at P.29:3-6.

17.     Victor was demanding a confession, and shouting the following threat: "Your family's going to go to prison.  We're going to take your wife to a prison in Kentucky.  We're going to put your son in a federal prison.  And your daughter, the U.S. government is going to take charge of her.  And we're going to give you from 15 to 30 years of prison." *Exhibit 1, Deposition of Armando Nieves Martinez,*at P.30:12-17.  *See also,* P. 36:8-15;  P. 39:9-12.

18.     Victor repeated the same threat five or six times. .  *Exhibit 1, Deposition*

*of Armando Nieves Martinez,* P.at 73:4-8.

19,    Mr. Nieves was afraid and felt threatened for him and for this family.  He did not know how Victor would react or what he would do.  He was afraid that Victor would hit him .  *Exhibit 1, Deposition of Armando Nieves Martinez,* at P. 33:7-25; 36:8-25 and 37:1-7. 69:1-4; 70:24:25; 71:1-3.

20.    Then 18 year old, Armando Jr. stated that he was filled with fear and apprehension because Victor told him, the same as his father, that his mother would be sent to Kentucky; his sister would be placed with the government and he and his father would go to prison.  *Exhibit 3, Deposition of Armando Nieves Pesqueira* at P.14:11-23.

21.    He also feared that Victor would strike him because he had just been released for neurological treatment for anxiety; he had just turned 18, and he was a "nervous person, hyperactive, scary, afraid;" he found Victor violent, so he tried to be friendly with him.  Victor repeatedly told the 18 year old to tell his father to have the balls to take responsibility and Victor took the 18 year old to his father cell once or twice during the questioning.  *Exhibit 3, Deposition of Armando Nieves Pesqueira* at P.13:21:25 and 14:1-6. And Pp. 8-13-16 and .8:25 and 9:1-9 and P. 10:5-21.

22.    Mr. Nieves was then taken to a second cell where the interrogation continued until Victor told Mr. Nieves that they found the drug -methamphetamine - in the windshield wiper container. *Exhibit 1, Deposition of Armando Nieves Martinez,* at P.36:16-17; 41:22-24.

23.   After hours of continued questioning, Mr. Nieves asked to speak with his wife,  *Exhibit 1, Deposition of Armando Nieves Martinez,*at P.36:18-24;  and 44:21-25; and P. 76:1-11.

24.    After initial denial, Victor agrees to the meeting, *Exhibit 1, Deposition of Armando Nieves Martinez,* at P.36:20-23.

25.    Mr. Nieves and his wife discussed the case, and they discussed the repercussions to the family if either he or Mrs. Nieves did not confess to the methamphetamine. .  *Exhibit 1, Deposition of Armando Nieves Martinez,* at P. 73:23-25; 74:1-6.

26.    Mrs. Nieves had also been threatened with prison in Kentucky. *Exhibit 2, Deposition of Amelia Pesqueira Ortega,* at P.13:16-17.

27.    While Mrs. Nieves was in a cell with her daughter, a female agent questioned Mrs. Nieves, and made derogatory statements about her father and her family front of her daughter. *Exhibit 2, Deposition of Amelia Pesqueira Ortega,* at P.15:17-25.

28.    The couple then had a meeting in front of Victor where they quickly discussed their options:  If one of them confessed the family would be freed, if not Mrs. Nieves would be sent to Kentucky, their daughter would be taken by the federal government and Mr. Nieves and his son would be imprisoned.  *Exhibit 1, Deposition of Armando Nieves Martinez,* at P.36:24-25 and 37:1-7 P.73: 1-20; 74: 7-25.

29.    It was at this meeting that, feeling pressure and anguish about the loss of their family, Mr. and Mrs. Nieves decided to have Mr. Nieves confess to a crime he had not committed., *Exhibit 1, Deposition of Armando Nieves Martinez,* at P. 36:24-25; 37:1-7 and 75:1-25; 76:1-14.

30.    Mr. Nieves then confessed to Victor that the methamphetamine was his; he did not give details. He only said,  "Okay.  I will be the responsible party here in this and just so you can set my family free and prevent them from going to prison." *Exhibit 1,*

*Deposition of Armando Nieves Martinez,* at P.46:13-15.

31. After his acknowledgement, the family was immediately released and Mr. Nieves was transported to Phoenix. . *Exhibit 1, Deposition of Armando Nieves,* at P.13; 17-25, 14: 1-23; *Exhibit 2, Deposition of Amelia Pesqueira Ortega,* at 19:1-8; 20:7-19.

32. Mr. Nieves is handcuffed with chains on his bare feet and is taken to Phoenix with Victor and two other agents. . *Exhibit 1, Deposition of Armando Nieves,* at P.48:21-24; *Exhibit 2, Deposition of Amelia Pesqueira Ortega,* at P. 20:10-15.

33. On the way to Phoenix, Victor and the driver started saying that they do not have details and that they needed additional information. Mr. Nieves stated that he did not have any other information and repeated to them that the information he has given them is false and that he provided it to save his family and out of his own fear of prison. *Exhibit 1, Deposition of Armando Nieves,* at P.48:24-25 and 49:1-4.

34. Victor then told Mr. Nieves that if he did not provide additional information, they will bring the family back to the Ajo Station. The agents then pretended like they were talking on the phone and started demanding the needed information. *Exhibit A, Deposition of Armando Nieves,* at P.49:5-13.

35. Victor kept insisting and the driver screamed in English that if he did not provide the information, Mr. Nieves "fucking family is going to prison." Victor was threatening that the Agents would bring your family back, he said, "Have the balls to save your family, put an end to this." *Exhibit 1, Deposition of Armando Nieves,* at P. 49:14-23.

36. Fearing for his family, Mr. Nieves agreed to talk, but Victor provided many of the details, like the amount of money to be paid, the drop off place, *Exhibit 1,*

*Deposition of Armando Nieves,* at P. 48:24-25, and 49:1-24; 50:1-24; 51:1-24; 76:15-25; 79:5-10.

37.    Mr. Nieves told Victor about six times that he was giving him false information to save his family, two or three at the cell and two or three in the car. *Exhibit 1, Deposition of Armando Nieves,* at Pp. 61:5-14 79:11:21.

38.    Because Mr. Nieves did not state much of the information he was told that Victor wrote down, he believes that what Victor wrote down, was fabricated. *Exhibit 1, Deposition of Armando Nieves,* at P. 80:3-15;

39.    Unbeknown to the Plaintiffs, the Disrupt Unit of the Border Patrol had received information that there will be a vehicle with a hidden compartment containing narcotics. *Exhibit 4, Deposition of Agent Victor Casillas,* at Pp. 13:24-25 and 14:1-25; 15:1-12.

40.    According to Agent Casillas, the Disrupt Unit supervisor, the vehicle the Unit was expecting "would be a family unit, Sonoran plated SUV, possibly an expedition. Not certain." *Exhibit 4, Deposition of Agent Victor Casillas,* at P. 14:17-25.

41.    Agent Casillas stated that the Unit began receiving the information the day before and that Mr. Nieves car was the only car that met the specifications. *Exhibit 4, Deposition of Agent Victor Casillas,* at P. 15:1-12.

42.    Agent Devin Reno, another member of the Disrupt Unit at the time had been posted to State Routes 85 and 86 in the Town of Why on the lookout for the vehicle that matched the description provided by Agent Casillas to all members of the Disrupt Unit, "[A] gold or tan SUV, it would be Sonoran plated, and that there would be a family unit.*" Exhibit 5, Deposition of Agent Devin Reno,* at P. 10:7-25 and 11:1-5.

43.     According to Agent Reno he saw around five vehicles that matched the same description, *Exhibit 5, Deposition of Agent Devin Reno,* at P. 13:1-25 and P. 14:2-3. and P. 19:2.

44.     Agent Reno and his partner called Agent Casillas to notify him about the vehicles that matched the team's description.  *Exhibit 5, Deposition of Agent Devin Reno,* at P. 19:6-8.

45.     Agent Wander Falette, another member of the Disrupt Unit said that his supervisor – Agent Casillas – told the Unit members to be on the lookout for " [A] white SUV with a family or something that resembled a family."   *Exhibit 6, Deposition of Wander Falette,* at P. 14:23-24.

46.     Agent Roden, the K9 Agent, said that the Disrupt Unit members described the vehicle as, [A] red Explorer, Navigator, whatever it was, it's supposed to be loaded." *Exhibit 7, Deposition of Agent Matthew Roden,* at P. 18:3-8, and 19:7-9.

47.     Agent Casillas says that he notified the Agents at the checkpoint that they were expecting a vehicle containing hard narcotics in a hidden compartment without specifying the vehicle. . *Exhibit 4, Deposition of Agent Victor Casillas,* at P. 21:5-16. and P. 31:2-5.

48.     Mr. Nieves vehicle met the criteria and was stopped at the checkpoint after the dog alerted. . *Exhibit 4, Deposition of Agent Victor Casillas,* at P. 19:17-25 and 18:1.

49.     Agent Casillas states in his deposition that the only agents who had the information and criteria of the vehicle were the members of his Disrupt Unit. He further stated that – aside from the members of the disrupt unit - neither the canine handler nor any of the other Border Patrol Agents at the checkpoint had a description of the SUV or

knew what they were looking for, because, "When doing our operations, we always do our operations in a form where it will be easier for attorneys to interpret, and checkpoint -- perfect example of why we didn't pull it over prior to it arriving at the checkpoint.  No notifying the agents that they assigned to it, is -- they were doing their normal duties. They were operating in their own capacity without prior knowledge or information from what I had." *Exhibit 4, Deposition of Agent Victor Casillas,* at P. 20:2-7; 85:1-25 and 86:1.

50.     Agent Casillas said that he received a telephone call from the people at the first checkpoint that a car went by that fit the description but they waited until the second checkpoint because "they wanted the dog to do its confirmation, and do its work." *Exhibit 4, Deposition of Agent Victor Casillas,* at P. 28:20-25 and P. 29:1-10 and P. 31:23-25 and P. 32:1-4.

51.     K9 Agent Roden, who was not a member of the Disrupt Unit, states in is deposition that he was provided the particulars for the suspects vehicle by either agent Victor Casillas or Brendan Carson and when he saw the vehicle coming up he ran the dog and that the dog alerted to the front grill area of the vehicle. *Exhibit 7, Deposition of Agent Matthew Roden,* at P. 18:3-15 and P. 19:2-13.

52.     When asked if he was waiting for that vehicle, Agent Roden stated that he was waiting for it, but that if the dog had not alerted he would have let it go. *Exhibit 7, Deposition of Agent Matthew Roden,* at P. 19:14-24.

53.     Agent Roden stated that after the dog alerted he told Agent Carlos Roman to send the Nieves family car to secondary.  *Exhibit 7, Deposition of Agent Matthew Roden,* at P. 21:16-23.

54      Agent Rodent states that once in secondary, the Nieves were taken outside the vehicle, He does not remember the primary agent or the number of people in the vehicle, or what they looked like.  *Exhibit 7, Deposition of Agent Matthew Roden,* at P. 28:3-19.

55.      He states that once the Nieves had exited the vehicle, he conducted an exterior sniff of the vehicle with the same results and he cannot remember if the canine conducted a sniff of the interior of the vehicle, or if he put the canine in the vehicle and conducted the search.. *Exhibit 7, Deposition of Agent Matthew Roden,* at P. 28:22-25 and P. 29:1-13.

56.      Agent Roden does not remember if he was alone or if other agents were with him. *Exhibit 7, Deposition of Agent Matthew Roden,* at P. 29:14-18.

57.      Agent Roden does not remember what part of the vehicle he searched at secondary. *Exhibit 7, Deposition of Agent Matthew Roden,* at P. 30:20-24.

58.      Agent Roden stated that based on the alert and the information that the Disrupt Unit had, the vehicle was taken to the garage at the Ajo Border Patrol station. *Exhibit 7, Deposition of Agent Matthew Roden,* at P. 31:4-18.

59.      Agent Roden states that he does not remember if there two dogs at the checkpoint. *Exhibit 7, Deposition of Agent Matthew Roden,* at P. 33:18-25.

60.      He said that if there were two dogs at the checkpoint they wouldn't have run the second dog near the vehicle to avoid bad law, that is, one dog may alert and the second one may not because of a change of wind. *Exhibit 7, Deposition of Agent Matthew Roden,* at P. 33:1-23.

61.      Plaintiffs expert, Mr. Edward Dobbertin, Jr. disagreed with Agent

Matthew Rodden's findings: " The detection canine team's search of the plaintiff's vehicle was not complete, thorough or within established and acceptable canine training, handling, utilization and/or practices or procedures and techniques that took place on August 18, 2011." *Exhibit10, Deposition of Plaintiffs Expert, Edward Dobbertin, Jr,.* at P. 9:4-8.

62.     " . . . As he went across the front of the vehicle he said that his dog gave him indications but did not alert. .   .   ."*Exhibit 10, Deposition of Plaintiffs Expert, Edward Dobbertin, Jr.,* at P. 9:11-13.

63.     "[H]e said that he sniffed and had indicators. Alert by definition, even by the CBP, is to get as close to the source as possible, and to have a passive alert, meaning that the dog changes posture, the ears usually change.  Normally the dog will sniff or inhale deeply and get as close to the source of the odor as possible and then passively sit or lie down." Alert by definition, even by the CBP, is to get as close to the source as possible, and to have a passive alert, meaning that the dog changes posture, the ears usually change.  Normally the dog will sniff or inhale deeply and get as close to the source of the odor as possible and then passively sit or lie down." *Exhibit 10, Deposition of Plaintiffs Expert, Edward Dobbertin, Jr.,* at P. 9:21-25 and 10:1-2.

64.     Asked if Agent Roden had not stated that his dog alerted, Mr. Dobbertin answered: "Well, you know, in my reading of the testimony he went back from sniff to alert because in the CBP manual it says that a sniff is not a search and a sniff alone will not give you probable cause.  But an alert will give you probable cause." ." *Exhibit 10, Deposition of Plaintiffs Expert, Edward Dobbertin, Jr.,* at P. 10:10-14.

65.     Mr. Dobbertin opines that Agent Rodden's description of the alert in

primary was a sniff, not an alert; that the dog was not allowed to finish eliminating any external odors or the environmental conditions that would pinpoint that it was this vehicle. And, in secondary, again, he failed to make a description by just stating that the dog alerted; he again described a sniff, the dog's posture changed, breathing changed, and gave a head shot, but did not eliminate whatever odor the dog was detecting. . *Exhibit 10, Deposition of Plaintiffs Expert, Edward Dobbertin, Jr.,* at P. 10:19-24 and 11:20-25 and 12:1-5.

66.    Mr. Dobbertin states that the dog handler should have eliminated the odor emanating from the vehicle by putting the dog's nose where the odor is emanating from; this includes a thorough search of the SUV; the dog needed to search the wheel wells, underneath the vehicle on top of the doors, the hood, the grill, and then back away from the vehicle because "odor as it travels away from an object is normally higher than the dog's head, and as you get farther away the odor has a tendency to settle a little bit more where the dog's nose is located."  Gleaning from his testimony, he said, the search was incomplete.  "[H]e walked around the vehicle and as soon as he got to the front of the vehicle that ended it. "  *Exhibit 10, Deposition of Plaintiffs Expert, Edward Dobbertin, Jr.,* at P. 13:1-25. and P. 14: 1-5.

67.    Based on these findings, Mr. Dobberting concluded that the dog did not alert:  When asked if he was convinced that the dog actually did not alert, he stated, Correct.  " . . . [M]y opinion is that due diligence in dog handling and detection dog handling is to ensure that you want to pinpoint the source of the odor, that it's not mere contact transfer, or that the odor is emanating from another something else, another vehicle, because you have no control once that odor emanates from the source.

Somebody could have casually touched the vehicle and that's what caused the dog's desire to investigate this odor that she was sniffing. And by their eliminating the possibility that this was just a casual thing and, thereby, if he furthered the sniff and furthered the search and further detailed the vehicle, there's a possibility that they would have thus lost their probable cause because the dog went, oh, no, that's not an odor I'm trained to detect .  . ." *Exhibit 10, Deposition of Plaintiffs Expert, Edward Dobbertin, Jr.,* at Pp. 17:8-21 and 18:20-22 and 19:9-25; and 20:1-25 and 21:1-2. And P.29 23:25 and 30:1-2.

68.    Based on these factors, he said, there was no probable cause to search the vehicle. "If he didn't fully alert, then they didn't have probable cause." *Exhibit 10, Deposition of Plaintiffs Expert, Edward Dobbertin, Jr.,* at P. 16. 17-18; P. 22:22-24. P. 28:13-14 and P. 30:1-2.

69.    Furthermore, Mr. Dobbertin states that Agent Roden's report was lacking in specifics; his report was a paragraph long and he could not recall even the color of the vehicle or if he searched the interior of the vehicle. "[Agent Roden's] police report or the addendum of investigation that he did, his memo, was one paragraph long and I didn't contain enough information in there that he could even properly identify the vehicle four years later.  The other agents involved, again, they surmised because Agent Roden said that his dog alerted therefore, we searched and we continued on.  Their reports are somewhat lacking in just – and I make this opinion based upon my 37 years of law enforcement experience, having been a supervisor, having been a chief of police and having reviewed numerous reports, you know, and lack of basically if it's not written down, then id didn't occur.  And there's case law on it that Border Patrol agents, detector

dog handlers are trained on and made aware of when they're going through school" ." *Exhibit 10, Deposition of Plaintiffs Expert, Edward Dobbertin, Jr.,* at Pp. 32:24-25 and 33:1-8 and P. 33:16-25 and 34:1-5.

70.    Agent Dobbertin opines that Agent Roden misinterpreted the dog's sniffing as an alert because he was "predisposed to the belief that the Nieves vehicle contained contraband most likely due to the information provided by Agent Casillas." "[T]here was a lot of pressure to find contraband in this vehicle"  When the dog signaled, he called it an alert, "instead of just one of the indicators that he should further investigate this" .*Exhibit 10, Deposition of Plaintiffs Expert, Edward Dobbertin, Jr.,* at P. 38:15:22 and p. 39:14-25 and 40:1-6 and 40:18-19.

71.    Agent Casillas describes the Border Patrol office at the checkpoint as a conex, a metal bin with air conditioner partitioned with a holding cell and the rest of it is an office. ." *Exhibit 4, Deposition of Agent Victor Casillas,* at P 17:14-19.

72.    Mr. Nieves and his family and car were brought to the Ajo Border Patrol Station. The car was taken to the garage. ." *Exhibit 4, Deposition of Agent Victor Casillas,* at P. 37:18-20 and P. 41:2-13.

73.    Agent Casillas states in his deposition that he did not allow a conversation between Mr. and Mrs. Nieves, but states that he allowed the son to speak with his father. ." *Exhibit 4, Deposition of Agent Victor Casillas,* at P. 63:22-25 and P. 64:1-9 and p. 65:1-6.

74.    Agent Derryberry states that he witnessed the conversation between Mr. and Mrs. Nieves and he overheard Mr. Nieves say, "I'm prepared to talk.  I just want to talk with my family first . . . An I remember the two of them talking.. . . I saw the

plaintiff in the main room he was interviewed in and then I know he was taken to another room, which is where I observed him speaking to his wife." *Exhibit 8, Deposition of Agent Brian Derryberry* at P. 41:14-23 and P. 42:22-25.

75.     Agent Falette also remembers seeing Mr. Nieves speak to Mrs. Nieves; he says that he was in the processing area when he "saw the husband wife talking." *Exhibit 6, Deposition of Wander Falette,* at P. 23:2-19.

76.     Agent Casillas states that he and Agent Carson and Derryberry transported Mr. Nieves to Phoenix. ." *Exhibit 4, Deposition of Agent Victor Casillas,* at P. 67:11-21.

77.     Agent Casillas said that Agent Derryberry was driving the car. ." *Exhibit 4, Deposition of Agent Victor Casillas,* at 70:10-11.

78.     Agent Casillas said that Mr. Nieves told him the details of the Chandler Mall delivery at the station, not at the car, "After [Mr. Nieves] confessed he told me that he was to park the vehicle at the Chandler Mall.  They were to go shopping and a couple hours later the vehicle would be back empty."  Agent Casillas wrote a note in the car to Phoenix that reads in part: "Tony was going to pick up Expedition in Chandler Mall.  He has spare key.  He was told to go shop and they would return SUV back to same spot." *Exhibit 4, Deposition of Agent Victor Casillas,* at 69:4-9 and P. 71:8-10.

79.     Agent Reno stated in his deposition that, "At the time, We had some information that they might have been going to a mall in Phoenix, that the vehicle would be dropped off, and from there someone would come and pick put the narcotics." *Exhibit 5, Deposition of Agent Devin Reno,* at 56:4-7.

80.     Agent Derryberry states in his deposition that he could not hear the conversation between Mr. Nieves and Agent Casillas in the car to Phoenix, but that Agent

Casillas provided him with the notes taken in the car.  *Exhibit 8, Deposition of Agent Brian Derryberry* at P. 17:2:21.

81.     Agent Derryberry states that on the way back to Phoenix, he overheard Victor and Mr. Nieves speaking in Spanish and that Victor relayed to them that he told Mr. Nieves, "Look, you promised to tell us the truth and we promised to let your family go.  If you're not going (sic) follow through with your promise, why should we follow through with ours? .  . . I can't say it was heated, but was definitely a back and forth conversation." *Exhibit 8, Deposition of Agent Brian Derryberry* at P. 46:7-14.

82.     Once in Phoenix, as he was being led for overnight to the immigration jail, Mr. Nieves became very emotional and told Mr. Derryberry that he didn't know anything about the drugs and he was willing to say anything to save his family from going to jail. *Exhibit 8, Deposition of Agent Brian Derryberry* at P. 19:23-25 and P. 20:1-17.

83.     Agent Reno states in his deposition that the Intel the Disrupt Unit had was that there were vehicles that were carrying liquid methamphetamine through the checkpoints. *Exhibit 5, Deposition of Agent Devin Reno,* at 55:8-10 and 55:17-20 and 55:25, 56:1-2.

84.     Agent Garcia Mendez was asked by Agent Roden to help him search the vehicle that Agent Roden's dog had alerted to. ." *Exhibit 9, Deposition of Agent Francisco Mendez Garcia.*at P. 18:4-5.

85.     Agent Garcia Mendez says that, addition to Agent Roden, Agent Reno, his partner, and Agent Watson was also present.  *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 20:12-25, and P. 21:1-10.

86.     Agent Garcia Mendez said that he was called because he had just finished

the Desert Snow Training that taught him about over 250 different concealment compartments. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 22:3:13.

87.     He said that Agent Nicholas Watson – who is also a K9 handler - participated with him in Desert Snow Training and that *Agent* Watson gave him the field drug kit that he used that day. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 11:8-5 and 11:1-5; and P. 22: 14-16.

88.     He said that the first place he checked was the reservoir fluid for the windshield wiper container because he was taught at the Desert Snow training that, "other agencies had encountered liquid narcotics in washer fluids."   *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 23:1-7.

89.     Agent Mendez Garcia was part of the Disrupt Unit with Agent Reno and their supervisor was Agent Casillas. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 23:19:25 and P. 24:1-10.

90.     He said that he took his flashlight and lit the hole where the liquid is located and that it did not look normal; instead of being blue, it looked cloudy, murky, and he, "[S]aw the replication of the compartments at the [Desert Snow] training."  At the training, he said, they had work stations with fluid replicas of what agencies had encountered in the past, and that, if it looks cloudy when you flash the light, it's some sort of narcotic. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 27:20-25 and 28:1-15.

91.     After he observed the fluid, he called Agent Watson, and they decided to test it. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia.*at P. 33:21-25 and 34:1-12.

92.    He then said, that he used the Desert Snow took kit that belonged to Agent Watson. It was only provided to K9 handlers. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 34:18-25 and P. 35: 1-9.

93.    Agent Mendez Garcia said that he then took a wooden rod, or stick from Watson's kit. He had been told at the Desert Snow, to,  [T]ake that rod and you get a clean – what do you call them?  Paper towel.  You wrap it around one end, a little piece around one end of the stick, and you dip it in the liquid, swirl it.  Bring it out.  Let it dry.  And then once it's dry you cut a piece and put it in the little narco pouch. "  *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 35:22-25 and P. 36:1-3.

94.    Asked if the Rod was designed to use with this test, he stated that, it had multiple uses and that although he was not instructed in the Academy, he learned its use in the Desert Snow training. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 61:14-25 and P. 62:1-2.

95.    Agent Mendez said in the deposition that he did not remember how long he waited, or how long it took for the paper to dry, but it was hot in August.

96.    He obtained the field drug kit from Agent Watson's car – it was not in the box kit – both walked together to Agent Watson's car and retrieved the drug pouch. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 36:12-24.

97.    He said that he did different tests for different drugs, and the methamphetamine test came back positive for methamphetamine. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 37:17-21.

98.    He said that he did two tests for methamphetamine and he doesn't remember if one "Was negative or not.  From my recollection, I recall both being

positive."

99.     He did not remember if someone took pictures of him doing the tests, or of the tools he used, and with the exception of his narrative, he did not have any written memoranda that showed his tests and the narrative did not mention two tests. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 38:9-24.

100.    Agent Mendez did not recall telling his supervisor, Agent Casillas, that he had done two tests. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 39:11-23.

101.    Agent Devin Reno, in his deposition says that at least two tests were conducted. *Exhibit 5, Deposition of Agent Devin Reno,* at P. 53:7-11.

102.    Agent Reno initially stated twice that the field test performed was positive but when asked directly if there were two tests and what were the results of the first test, he said, that the first test was negative, and discussed it with Agent Mendez who, [R]ecalled from his training that liquid methamphetamine is heavier than water, so that the next test should probably be taken from the bottom of the tank, of the washer fluid tank, and not from the top.  Initially he took it from the top.  And when he scooped out from the bottom and tested that, that came back positive." *Exhibit 5, Deposition of Agent Devin Reno,* at P. 42:20-24; 49:3-4 and P.54:16-22 and P. 56:17-24.

103.    He stated that Agent Mendez then tested from the bottom and it came back positive. *Exhibit 5, Deposition of Agent Devin Reno,* at P. 57:1-3.

104.    Agent Reno stated that he advised Agent Casillas that there were a negative and a positive test. *Exhibit 5, Deposition of Agent Devin Reno,* at P. 59:12-20.

105.    During deposition Agent Derryberry stated that he was not told that there

were two tests and one was negative.  He was told that there were two tests and both were positive. *Exhibit 8, Deposition of Agent Brian Derryberry* at P. 38:19-25 and 39:1-5.

106.    Agent Reno said that Mendez and he narrowed it down to methamphetamine because he recalled that, "Intel stated that the method being utilized was to transport liquid methamphetamine in the vehicles."  Intel stated that the method being utilized was to transport liquid methamphetamine in the vehicles. "  *Exhibit 5, Deposition of Agent Devin Reno,* at P. 55:8-20.

107.    Agent Reno stated that , the Disrupt Unit had information that, "[O]ver time there had been vehicles that had come to the checkpoint with liquid methamphetamine in them . . . that might be going to a mall in Phoenix, that the vehicle would be dropped off, and from there someone would come and pick up the narcotics." *Exhibit 5, Deposition of Agent Devin Reno,* at P.  55:25 and 56:1-7.

108.    Agent Mendez said that at his Academy training he had been told to document everything he was doing, but that he interpreted that to mean, "[W]rite that we tested it." *Exhibit 9, Deposition of Agent Francisco Mendez Garcia.*at P. 56:22-25 and P. 57:1-4.

109.    Agent Mendez said, that he handed everything, the instructions and the used kits to the Homeland Security Investigation, to either Agents Doyle or Derryberry. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia.*at P. 58:13-24.

110.    Agent Mendez acknowledges that the drug kit instructions state that the kits are not to be used with liquid samples, but argued that he had a "dry one, because I let it dry." . *Exhibit 9, Deposition of Agent Francisco Mendez Garcia.*at P. 59:9-25 and 60:1.

111.    Agent Mendez acknowledges that, for the test, he used a hand rinsing paper towel from the cabinet in the garage. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 60:6-16.

112.    Agent Mendez said that he was told at Desert Snow training to use the wooden stick, take a paper towel, let it dry and cut a piece of paper, place it in the kit and let it dry, and then do the test. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 62:7-13.

113.    Agent Mendez said that he got the hand rinsing paper towel, inserted it in the fluid and kept the part that was wet and discarded the other part of the paper towel; he put the wet part to dry on a metal bench that he previously cleaned with unknown spray solvent.  *Exhibit 9, Deposition of Agent Francisco Mendez Garcia.*at P. 62:14-25 and P. 63:25.

114.    Agent Mendez does not remember how long it took for the towel part to dry. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 64:9-14.

115.    He then used small samples – one to two inches - of the dry towel to test in the pouch he had. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 64:18-25 and 65:1-11.

116.    Agent Mendez acknowledges that the drug kit instructions state, "The choice of towel is critical.  Unscented, uncolored filtered paper is ideal.  Never use brown paper, hand towels or newspapers."  He argues however that the paper towels he used were not hand towels: "A towel that my wife hangs in the kitchen, a little cloth towel. That's a hand towel, to me."

117.    Agent Mendez said in the deposition that he called Agent Casillas from his

phone to report what he had found. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 72:11-24.

118.   Agent Mendez did not know the difference between amphetamines and methamphetamines. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 73:3-5.

119.   Agent Mendez did not know the meaning of polytesting. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 71:14-19.

120.   Agent Mendez said that he was not trained on how to use the test kits at Desert Snow. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 76:19-25 and 77:10.

121.   Agent Mendez stated that he had never tested liquid components before.  He had never encountered them and this was his first time, and it occurred to him because of the concealment method he had heard at Desert Snow.  *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 77:11-17.

122.   He stated he is not familiar with FDA approved tests like for probation violations; truck drivers, railroad workers, etc.  *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 78:8-14.

123.   Asked if he has on going training to assure competence, he said, he didn't know. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 80:10-12.

124.   He stated that he had never done quality control testing. Providing agents with different substances and requiring the agents to identify them.  *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 80:13-19 and 81:5-13.

125.   He said that all agents in the field can do the testing and all are similarly

trained at the Border patrol Academy. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 80:20-25 and 81:1-4.

126,   he said that he did not know if the field test kits are tested periodically to make sure of their correct operation. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 81:22-25.

127.   Agent Mendez said that he did not know if the kit he used from Agent Watson's car was checked to make sure it wasn't overheated or otherwise contaminated. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 82:4-11.

128.   Agent Mendez stated in his deposition that his only training for field test kits was at the Academy in 2008-2009 and that the Desert Snow training was not scientific. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 7:5-16.

129.   He said that his only proficiency test was at the Border Patrol Academy and that he did not if Border Patrol did periodical proficiency tests regarding the drug field tests. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 82:12-17.

130.   Agent Mendez could not recall if he had ever been given a test of an unknown substance. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 82:18-20.

131.   Agent Mendez said that the field drug test instructions state that to assure that the substance is a methamphetamine the agent must perform test U after test A. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 85:11-25 and 86:1-14.

132.   Agent Mendez stated that he did not know if he had done the U test. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 85:11-25 and 86:1-14. 86:1-25.

133.    Agent Mendez could not identify any evidence – photographic or otherwise - that he did test U. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 109:3-25 and P.110:1-19.

134.    Agent Mendez said that he did not take notes of the tests he did; he only used the half page narrative he had provided. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 99:2-15.

135.    Agent Mendez did not label his tests.   *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 100:1-9.

136.    Agent Mendez said that it would make sense to test for methamphetamine from the bottom of the windshield liquid reservoir. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 101:9-12.

137.    He did not recall a smell to the liquid he tested from Nieves car. *Exhibit 9, Deposition of Agent Francisco Mendez Garcia,* at P. 102:22-25.

138.    Dr. Leo Kadehjian explained that his expertise is understanding the chemical tests that were performed and how those tests "[W]ork, what their strengths and limitations are, and the  various testing methods that were presented to me in this case. That includes the tests that were done by Border Patrol as well as the tests that were done by the  DEA laboratory." *Exhibit 11, Deposition of Dr. Leo Kadehjian,* at p. 7:8-14.

139.    In addition to his vast work experience, Dr. Kadehjian's academic background included, his "undergraduate education at Harvard University in Cambridge Massachusetts where I took my first chemistry classes.  I then completed my undergraduate education at the Massachusetts Institute  of Technology, MIT, also in Cambridge, Massachusetts, where I earned a Bachelor's of Science degree in organic

chemistry, and that was in 1972. I then earned a Ph.D. degree in biochemistry from Stanford University, and that was in 1977, and that is the extent of my academic credentials." *Exhibit 11, Deposition of Dr. Leo Kadehjian,* at Pp. 7:25 and 8:1-9.

140.    In Dr. Kadehjian's opinion, "the test results do not support a presumption of methamphetamine being in the windshield washer fluid . . ."The science, he said, "doesn't support their making a presumption of methamphetamine in the windshield washer fluid." *Exhibit 11, Deposition of Dr. Leo Kadehjian,* at P. 14:1-10.

141.    He concluded from the information that he was provided that, "Mendez-Garcia did not follow the specified procedures and therefore, no scientific weight can be given based on the failure to perform the test properly. No evidence was presented that he, in fact, performed the test properly; and as a result, that's why the color tests that were performed by Mendez-Garcia do not provide a sufficient scientific foundation, and I have elaborated that in my review of what the peer-reviewed published scientific literature says about these tests and what the manufacturer says about these tests, so I think those two go hand in hand. *Exhibit 11, Deposition of Dr. Leo Kadehjian,* at P. 15:14-25 and 15:1-2.

142.    He said that he carefully considered his language, in his opinion that, "In order for these tests to have scientific weight, they need to be performed according to the manufacturer's instructions, and the only evidence that I was presented was that there was no documentation that they were, in fact, performed as specified by the manufacturer. And in detail, the manufacturer requires that Test A to be followed by a Test U, and only when they are performed in that sequence do you have even a presumptive presence of methamphetamine. I was presented numerous photographs. I

read the transcripts.  There was nothing that indicated that  a Test U was performed.  I know two Test A's were  performed, a Test B, a Test C or G.  You know, I was  shown pictures of several tests, and no Test U was  indicated and no testimony indicated that a Test U was performed." *Exhibit 11, Deposition of Dr. Leo Kadehjian,* at P. 17:8-24.

143.    Asked what are his feelings about the field tests, Dr. Kadehjian responded that,  "[F]eelings is probably not the right word. I'm a scientist, so I come to it with, you know,  more  than an emotional approach, but rather a cerebral one, intellectual one.   I am familiar with these types of  color tests, the subjective nature of the tests, reading them.   I am familiar with the underlying chemistry of  these tests and their specificity. That is, the false positive, false negative rates, those issues.

"Based  on  the  peer-reviewed  published  literature,  in  addition  to  my  own experience with these types of tests, I would say I give them little scientific weight. Now, is that sufficient for  reasonable suspicion?   Is it sufficient for probable  cause?   Is it sufficient for preponderance of the  evidence?   That's for a trier to decide where that level  of accuracy falls, and whether it allows the reader of   that test to then go further to make  some  further  judgments."   *Exhibit 11, Deposition of Dr. Leo Kadehjian,* at P. 19:16-25 and 20:1-8.

144.    Asked if methamphetamine would look murky or cloudy in a windshield fluid compartment, he stated that,  "[I]n the transcripts, there was a discussion of layers. The only way you would see that is if the methamphetamine was dissolved  in organic solvent, and that organic solvent would  separate from the water of the windshield washer fluid, and so you would have two separate layers, just like oil and vinegar when you are making salad dressing.

"I have seen no evidence that two layers were  noted or observed other than Mendez-Garcia saying that  his training said it might be cloudy or milky.   Furthermore, the pictures . . . that I saw of  them emptying the windshield washer reservoir into a bucket, that looked like clear windshield washer fluid to me from those pictures, and Agent Stevens also  indicated that she obtained homogeneous liquid  specimens.

"So I would say -- well, your question was:   What would I expect it to look like? And I think I have  answered that.  I expect it to look like windshield  washer fluids." *Exhibit 11, Deposition of Dr. Leo Kadehjian,* at P. 26:15-25 and P. 27:1-11.

145.    Asked if he saw evidence that Mr. Mendez Garcia was properly trained, he said that he had not seen any evidence of a certificate of competence or of his training with unknown specimens to demonstrate proficiency in testing. And that even in his deposition he could not recall details about his training.  Therefore, he said, he could not see anything that showed that he was properly trained. *Exhibit 11, Deposition of Dr. Leo Kadehjian,* at P. 28:17-25 and P. 29:1-6.

146.    Asked about his understanding of proper training, he responded as follows:  "So I understand the question.  When we are trained on any scientific method, there are training materials that are presented.  Sometimes there's a lecturer or it may be online training.  And you go  through this training process, but there needs to be a  demonstration of your competence at the end of the   training.  That is, you should be able to demonstrate   that you have actually used the tests.  You have tested  various materials, so materials that give true positive  results and materials that give false positive results.  You need to be able to demonstrate your ability to  accurately use these. That should be part of the  training program, and ideally, the trainer should certify that you, in

fact, demonstrated your competence  to me.

"Now, any laboratory, once they develop a method and learn how to use the method, they still need to  demonstrate that they are in an ongoing manner  performing the tests correctly.   So one of the things  that laboratories do is called proficiency testing where  periodically, you are given unknown specimens.  Here run this and show me that you are still getting the  correct answers, that you know how to do that.  Sometimes there's quality control where you routinely  test a known specimen to make sure you are getting the  right answer.

"You know, in the laboratory we know your chemicals can change over time. Maybe we get a new  batch of chemicals. So we need to make sure that those  chemicals are still working properly.

"The same with these NIK tests. You know, they need to be stored  properly. That's in the manufacturer's instructions.  They shouldn't be stored  in the trunk of a car at, you know, 110 degrees in the Sonoran desert, you know, that kind of thing.

"So to make sure that they are functioning  properly, periodically we should take one of that batch  and test it and say yes, it's still giving us the right  answers. That would be good laboratory practice.

"Now, does somebody need to have refresher training?    Some professional societies require that. Lawyers, you have to have continuing legal education,  right? Your state Bars require you to constantly get continuing education.

"In the clinical chemistry world, the people who  work in hospital and clinical laboratories have to have  certain number of refresher courses that they have to  demonstrate, so that they are maintaining their skill  level.

"So I am unaware of any refresher training that  Mendez-Garcia had.  There's no evidence that there was any refresher training using the kits.  There's no  evidence that there was a proficiency program or quality  control that the kits were stored properly and still  functioning properly.  So those are, in my view, gaps in what we would like to see when people are  performing tests. "*Exhibit 11, Deposition of Dr. Leo Kadehjian,* at P. 30:1-25, P. 31:1-25, P.32:1:8

147.    Asked if, in his opinion, the laboratory tests done by DEA were scientifically correct, Dr. Kadehjian said,  "In my report, I did indicate that I reviewed  both the laboratory results as well as the deposition of DEA chemist Stevens.  I was able to review the laboratory results that she provided and the tests that  she performed.  The tests that she performed were  sophisticated scientific methods that are well supported  in the peer-reviewed literature.  She performed   Fourier-transform -- F-O-U-R-I-E-R hyphen transform --infrared spectroscopy and importantly, the gold  standard, if you will,  of mass spectrometry, in particular, GC for gas  chromatography, mass spectrometry.  Those tests are regarded as absolutely  definitive when they are properly performed, and all the  evidence that I have been presented indicates that she  did perform these tests properly.  I was provided the  actual printouts.  Mr. Romo provided me that information.  So in my view, the tests that Agent Stevens performed are definitive and clearly demonstrated the lack of methamphetamine within the  windshield washer fluid specimens that she was provided." *Exhibit 11, Deposition of Dr. Leo Kadehjian,* at P. 28:17-25 and P. 29:1-6.

148.    Asked by Dr. Cantu, the government's expert opinion that he saw "no evidence that the sequential testing method was followed in which a positive result for

methamphetamine was detected."   Dr. Kadehjian opined that, "[T]he manufacturer clearly state you have got to do these two in sequence.  First Test A.  Then Test U.  All I've seen are pictures of Test A . . . but there's no picture of test U . . . And Cantu and myself both used the same language here.  We say there is no evidence that the sequential method was followed, so he, like me, is not  saying it 'wasn't followed. We know it wasn't followed.'  No, I can't say that.  All I know is there's no evidence that it was followed, and yet, there is all this  evidence about all the other tests that were done, but  no evidence that this test was done."

"And then I would question:  Well, if the most  important test for showing methamphetamine is the Test U after a Test A, if that was done, why wasn't  that most important test documented?  So I can only  presume that this test was not done.  That would be my presumption, but I have to admit, I have been presented  no evidence that that test was done.  .  *Exhibit 11, Deposition of Dr. Leo Kadehjian,* at P. 36:17-21 and P. 37:3-17.

149.    He said the there is no documentation that Agent Mendez had been given any training that would indicate that methamphetamine in windshield wiper fluid would look murky or cloudy.  "As I indicated, we have no documentation of Mendez-Garcia's training, what materials were used, who did the training.   Was there a Power Point? Were there  handouts?  So that training could have indicated this  cloudiness.  But in addition, I did obtain all of the NIK training materials, and that included two CD's, both  instructor training guides, Power Points, a competency  exam, accompanying notes for the instructors.  NIK has  many, many documents to provide training for their customers, and I do  not recall seeing anywhere in any of  those documents any mention of

methamphetamine looking  cloudy in windshield washer fluid." *Exhibit 11, Deposition of Dr. Leo Kadehjian,* at P. 33:21-25 and P. 34:1-7

150.    Dr. Kadehjian stated that Agent Mendez said in his deposition that he obtained the drug test kit from the car of the K9 handler, and, in his experience in Arizona the heat is unbearable in the summer time. .  *Exhibit 11, Deposition of Dr. Leo Kadehjian,* at P. 34:8-23.

151.    Dr. Kadehjian said that although the NIK tests are not designed to be used with liquids, as the windshield washer fluid, the manufacturer provides a sampler for testing liquids, but the instructions specifically warns against the use of paper towels, and the deposition of Agent Mendez, [I]ndicates  that he used a towel, a paper towel, that he wrapped around a stick  which he got I believe from a box or some car.  Well,  you know, this cannot be considered good laboratory  practice to take materials that you don't know are free  from any contamination.  You know, where was that stick?  Could it have some meth on it?  Where was that paper  towel?  Could it have some meth on it?  So I think the manufacturer is very careful to say you don't want to be  using these other materials to sample the liquid. *Exhibit 11, Deposition of Dr. Leo Kadehjian,* at P. 38:24-25 and 39:1-18.

152.    Regarding the probative value he said, [U]nless you run the  tests properly, it has virtually no scientific value.  It doesn't meet our scientific standards for having any  probative value from that test if it's not done correctly." *Exhibit 11, Deposition of Dr. Leo Kadehjian,* at P. 44:9-13.

153.    Dr. Kahdejian concludes that in his scientific opinion that Test A was not performed in accordance with the manufacturer's specifications and, even if it had been

properly performed, he found no evidence that the sequential test U was ever done: "The evidence that I have presented shows that Test A was not performed according to manufacturer's guidance because of the liquid sampling that was used. I don't know about the storage conditions. That may not have been compliant with the manufacturer's instructions. I don't know about the timing because they didn't mention any timing. There's no indication that they used a stopwatch or measured the result within this 10- or 12-second window, so those parts of the test procedure could also invalidate any result from Test A. But even if Test A, you know, was suitable, even though it was sampled with paper towels that could have been contaminated with a little bit of meth. We don't know. And improperly stored. Those issues. You can't get anything out of Test A regarding meth unless you run Test U; and unless that's done, Test A has little scientific value because there are too many other things that give this color in Test A, and that's all documented in the peer-reviewed literature. These papers I have cited have long lists of chemicals that give a reaction with Test A.

Let's remember, Test A is just sulfuric acid and formaldehyde. There's so many things that react with these chemicals, and that's documented in the literature. So Test A alone, even when it's properly performed, can't lead to any presumption of methamphetamine being there. All it can do is say all right. Now that Test A is giving me this color, now I will go and do another test on it. I will run Test U; and even after you run Test U, the manufacturer says you still need to go further to actually prove that it's meth. You need to send it to a laboratory. At least that was done in this case. *Exhibit 11, Deposition of Dr. Leo Kadehjian,* at P.44:17-25 and P. 45:1-25.

154.    Dr. Richard A. Leo's academic background includes a "Bachelor's degree

in sociology from UC Berkeley, a Master's degree in  sociology from the University of Chicago, and both a JD and Ph.D. from UC Berkeley. The Ph.D. was an  interdisciplinary law and social science program."  For this case he relied in his expertise as,  "[A] social psychologist and  as a criminologist, and within those areas, my area of  research expertise for the last three decades has been the psychology and practice of police interrogation and interviewing, psychological coercion, true and false  confessions and the wrongful conviction of the innocent."  *Exhibit 12, Deposition of Dr. Richard A. Leo* at Pp. 6:12-17 and 6:22-25 and 7:1.

155.    Asked if he is an expert on issues whether law enforcement had reasonable suspicion or probable cause, he responded,   "I do think so, yes.  I mean in addition to  being an empirical researcher and social psychologist  and criminologist, as you probably know, I am also a law  professor.  I teach constitutional criminal procedure to law students.  I am very familiar with the standards of  reasonable suspicion and probable cause and the case law  It usually comes up in terms of my expert opinions in cases that lead to interrogation and   confession, so in a pre-interrogation, investigatory  context." *Exhibit 12, Deposition of Dr. Richard A. Leo*  at Pp. 13:14-25 and 14:1-3.

156.    He stated that his opinion can encompass whether law enforcement had probable cause to detain Mr. Nieves Martinez as is relevant to the interrogation. *Exhibit 12, Deposition of Dr. Richard A. Leo,* at P. 14:4-8.

157.    Interrogation in the United States, he said, are not done unless, "[Y]ou are reasonably certain that the person committed a crime. . . so the techniques of interrogation are not about evaluating the evidence, but about accusing somebody, cutting off their denials, confronting them with alleged evidence, inducing them to say

what you want them to say." *Exhibit 12, Deposition of Dr. Richard A. Leo,* at P. 23:2- 3; and P. 24:11-16.

158.    He said that presently studies cannot quantified false confessions' rate of frequency or occurrence "We do have studies documenting hundreds of what we call proven false confessions where you can show no crime occurred or it  was physically impossible for the confessor to have committed the crime or you have got scientific evidence  that definitively excludes or exculpates the confessor  or the true perpetrator has confessed and excluded the  perpetrator.   So we know hundreds -- the confessor,  rather.  So we have documented hundreds of proven false confessions, but the belief is that's the tip of the iceberg. *Exhibit 12, Deposition of Dr. Richard A. Leo,* at P. 25:15-25 and P. 26:1.

159.    He said, it is not scientifically meaningful to speak about percentage of confessions that are true or false, rather the analysis must be on  "[T]the interrogation techniques and the risks they create." *Exhibit 12, Deposition of Dr. Richard A. Leo,* at P. 27:6-10.

160.    Asked if the patterns described in his opinion, about the psychological techniques of interrogation, fit Mr. Nieves case, Dr. Leo, stated, "Well, yes.  The first pattern says that the  suspect was threatened with a higher charge or a harsher sentence or punishment if he doesn't provide a  satisfactory statement, but will receive a lesser charge or sentence, perhaps no punishment at all, if he does. Mr. Nieves reports that he was threatened with going to prison, with having his family separated and go to  prison if he didn't confess, so it fits that pattern.

"And also, the second one, the interrogator  wears down or distresses the suspect

to the point of essentially hopelessness and the feeling of no control or intolerable stress, and that's what -- leading to the decision to confess, and that's what Mr. Nieves  describes in his deposition, that he was terrified.  He felt he had no control, that his family would be  separated.  He wouldn't see his son and daughter.  His wife might be charged, spend time in prison.  So I think  for reasons articulated elsewhere in the report that  this case fits both patterns." *Exhibit 12, Deposition of Dr. Richard A. Leo,* at P. 31:3-25 and P. 32:1-5.

162.     Dr. Leo was asked if his opinion regarding the threats relies solely on Mr. Nieves testimony:  Well, two things.  One, the family members overheard the threats, so their depositions as well; and secondly, I just want to clarify that this is not a matter of my saying somebody said something and  therefore it's true.  As described in the report, I am relying on evidence and logic to reason that his account is the only one that fits the evidence since this is, in my opinion, a provably factually false confession and there needs to be an explanation for how that happened since they don't happen out of thin air or when there  isn't accusatory interrogation.  So I'm relying on his account as well as their accounts, and I'm also relying on the account of the police themselves, which makes no  sense in explaining how you got a provably false confession." *Exhibit 12, Deposition of Dr. Richard A. Leo,* at P. 32:13-25 and 33:1-6.

163.     Dr. Leo says that in addition to the family members, he is also relying in the officers depositions,  "The complete absence of  any acknowledgement of the kind of interrogation that we know from robust social science and empirical research  produces this kind of factually false confession.   So it's really their absence of any meaningful explanation of what had  to have occurred here to produce this result. " *Exhibit 12,*

*Deposition of Dr. Richard A. Leo,* at P. 33:13-19

164.   Asked how law enforcement wore down and distressed the suspect, Dr. Leo said, "Well, again, it's described by Mr. Nieves, and he describes being yelled at, being threatened, being led to believe that he would be separated from his family, his family would be harmed, that he had the choice of either letting that happen or confessing to something that didn't happen, so it's his description of the effect of their interrogation techniques on him that 6 fits the second pattern." . " *Exhibit 12, Deposition of Dr. Richard A. Leo,* at P. 33:20-25 and P. 34:1-6.

165.   Dr. Leo testified that admissions post confession must be free of contamination as discussed in page 15 of his opinion, "So to do the post-admission narrative process correctly, you have to not pressure or persuade the suspect to give you details that you know or believe. You have to let the suspect volunteer those details. *Exhibit 12, Deposition of Dr. Richard A. Leo,* at P. 35:11-15.

166.   Dr. Leo states that Mr. Nieves description of his post-admissions, reveals the suggestions by the Agents and their pressure and persuasion for Mr. Nieves to come up with details like the mechanic and the Mall pick up, and that "[H]e came up with details to make them happy, even though he knew those details were false. There were other details, like the $10,000 which I think they also suggested." The police, he said, failed to record the conversation but, he said, "We know from good research on proven false confessions that they almost always involve contamination, namely the police pressuring the suspect to come up with the details, not the suspect independently coming up with details." *Exhibit 12, Deposition of Dr. Richard A. Leo,* at P. 35:16-25 and 36:14.

167.   Dr. Leo stated in his deposition " [I]f you read the section of my report on

evaluating reliability, pages 13  to 15, you know that it's not the fact of a detail in a  self-incriminating account that matters.  It's the verifiability and confirmability of that fact.  So just because somebody is providing a detail doesn't mean that another person committed a crime or that they committed  a crime.  False confessions, just like true confessions, are full of details."  *Exhibit 12, Deposition of Dr. Richard A. Leo,* at P. 39:12-20.

168.    Asked if the officers believed they were hearing a false confession, Dr. Leo, states, "Yes.  As you know, I think that there was a reckless and incompetent pre-interrogation investigation  here, and if -- when they heard the confession they were  aware of the process that preceded it, right, the way the dog sniff was done, the threats and the promises  that were used to elicit, then yes, I think they should have had a suspicion that this was likely a false  confession.

" . . . I think if somebody had just  come in and had no knowledge or understanding of the  process that preceded his statement, it might have sounded very plausible.  After all, he was trying to  make it plausible because he was terrified about what would happen to him and his family if he didn't give them a satisfactory account.

On the other hand, if somebody did have an awareness of the process, then yes, they should have  realized that they were basically manufacturing a bogus  piece of evidence.  So it really depends on the person's 20   knowledge, once hearing the confession, of the process  that produced it. *Exhibit 12, Deposition of Dr. Richard A. Leo,* at Pp. 41:20-25 and 42:1:21.

169.    Dr. Leo States on page 18, subsection B, of his report that the pre interrogation investigation was "Incompetent, dishonest and/or reckless." He states he is

relying on the toxicologist and K9 expert for this opinion, "but obviously I am not just repeating those.  So with my knowledge of how  pre-interrogation investigation is supposed to be  conducted and relying on those reports and other  evidence in the case, that's the basis for my  conclusion."  *Exhibit 12, Deposition of Dr. Richard A. Leo,* at Pp. 42:22-25 and 43:8-13.

170.    Told that Mr. Dobbertin did not think that Agent Rodden acted intentionally or with malice, Dr. Leo, said, "Well, I think you know that to act recklessly is not the same in law as acting  intentionally, and that, as I explained in the report,  he created, they created a substantial and unjustifiable  risk, and so it could be that Chief Dobbertin, who is  not legally trained, was interpreting intentional  different than I am interpreting it.  I certainly made no representation that there was any malice here, and  when I think about malice, I think about that in a  criminal context, not in a civil context, but I do think based on what Chief Dobbertin said in his report, there  was incompetence with the dog sniff process.  The  process was not allowed to go forward the way it was  supposed to go forward in the ways that Chief Dobbertin describes, and that was a key error that led to other  errors, and I also think that the dishonesty is the  sanitizing of the process in the agent's description of what occurred.  Mr. Dobbertin might not have used the same terms, Dr. Leo said, but "his opinion supports that, particularly the incompetent part." *Exhibit 12, Deposition of Dr. Richard A. Leo,* at Pp. 43:23-25 43:20-22. and 44:10-25 and 45:1-2.

171.    Regarding whether Agent Mendez acted with Malice, Dr. Leo states, I say on page 19 in the middle of  the first full paragraph:  "Dr. Kadehjian concludes that Agent Mendez negligently applied improper procedures and  misinterpreted the results of

his color spot reports,  and thus, his reports that this visual test somehow indicated or confirmed that Mr. Nieves was transporting liquid methamphetamine were completely inaccurate and  unreliable.  So I never said that Dr. Kadehjian said that Agent Mendez acted with malice or that he  intentionally fabricated the evidence."

172.   Told by the government that Dr. Kahdejian believed Agent Mendez as just negligent, Dr. Leo, responded,   "Well, I mean I say incompetent, dishonest, and/or reckless.  It depends on how you interpret these facts, and it really goes to whether or not Agent Mendez knew that he was creating a substantial risk through the incompetent way in which he applied the procedures and  misinterpreted the results or whether he didn't, and if  he didn't know about that, then he was merely negligent,  and if he did, I believe he was reckless.  But again, my -- the title of that section, as you point out, is --  you know, the words are incompetent, dishonest and/or reckless.  At a minimum, he was incompetent."  *Exhibit 12, Deposition of Dr. Richard A. Leo,* at Pp. 45:18-23; 46:1-25 and 47:1-3.

173.   Asked what had Mr. Nieves been told that was not true, Dr. Leo said that the agents "repeatedly told him they had evidence against  him that indisputably proved he was guilty, so they had  the general representation that they had this indisputable evidence."   The Agents also misrepresented the significance of the dog alert and its accuracy; "The fact that a dog alerts, assuming the dog actually did alert, and the process -- the dog was allowed to do the normal dog sniff process, that doesn't  establish guilt." he said the he didn't know if the agents believed that the dog had not properly done the alerting process, but, he said,  "I do think they misrepresented the significance of  that as well as the accuracy of it."  With regard to the field test, he said, they may have truly

believed that the second one was positive, "[B]ut to the extent that they said this established that he was transporting methamphetamine across the border with intent to sell, I do think they, even if they genuinely believed it, exaggerate its significance. *Exhibit 12, Deposition of Dr. Richard A. Leo,* at Pp. 48:22-25; 49:1-24; P. 50:8-9; P. 50:16-25 and P. 51:1. It must be pointed out that there were two tests and the first one was negative. That this was reported to Casillas and that Casillas never told Derryberry.

174. Asked if after the apparent confession the agents lacked probable cause to continue to detain Mr. Nieves, he said, "It depends on how much information or knowledge you have of the process that produced that confession, and so I would say if somebody was knowledgeable about what occurred that induced that, then yes." *Exhibit 12, Deposition of Dr. Richard A. Leo,* at P. 51:10-17.

175. During the deposition Agent Casillas stated that in spite of the DEA findings that the fluid did not contain any drugs, Mr. Nieves is still guilty of, "Transporting meth . . . Based on the evidence that [he] had." *Exhibit 4, Deposition of Agent Victor Casillas,* at P. 78:9-12

176. When pressed that he now knows that the "meth is not meth," he retorted that he knows that, "the sample taken tested inconclusive or with not meth on it." *Exhibit 4, Deposition of Agent Victor Casillas,* at 78:13-16.

177. When confronted with the evidence that the DEA test conclusively established that there was no methamphetamine in the fluid, he said. "I had the information that I did, and that's what the determination I came up with based on the information and evidence that I had." *Exhibit 4, Deposition of Agent Victor Casillas,* at P. 78:17-23.

178.    Agent Casillas said that he inputted the report that my client was transporting methamphetamine into the database called E-3. *Exhibit 4, Deposition of Agent Victor Casillas,* at P. 79:2-9.

179.    Asked again if he still thought that Mr. Nieves had methamphetamines, he said "Yes," and provided no information about how to correct, edit or supplement information into the E-3 database even as all other Border Patrol Agents could query by name the information about Mr. Nieves from the E3 database *Exhibit 4, Deposition of Agent Victor Casillas,* at P. 80:20-23 and Pp. 81:1-25 and 8:21-25.

180.    Agent Reno, when confronted with the evidence that the DEA test showed that there were no drugs in the windshield fluid, said, "I'm aware that a test came back negative.  Not the test we performed." *Exhibit 5, Deposition of Agent Devin Reno,* at P. 39:19-21.

181.    When asked if he believed the field test rather than the scientific DEA test, he said, "I'm not saying that one way or the other. I'm telling you that we ran a test, and the test came back positive." And, he said, as far as he's concerned, Mr. Nieves had drugs. He continued,  "Based on everything that I knew at the time, based on the canine alert, based on the intelligence that we received, and based on the test that we performed, at that time, I believed that he had narcotics in that vehicle." *Exhibit 5, Deposition of Agent Devin Reno,* at Pp. 40:6-16.

182.    Agent Reno cast doubt about the DEA test saying,  "I was verbally told by my supervisor after the fact that a test came back negative. As far as what test was run, I don't know." *Exhibit 5, Deposition of Agent Devin Reno,* at P. 40-20-22.

183.    Agent Reno said that all biometrics go into the E3 database and if there is

a criminal or an immigration record that matches the name, date of birth, then it will pop

up; and, as in the case of Mr. Nieves, the reports generated, are done in E3 and attached

to the E3 file. *Exhibit 5, Deposition of Agent Devin Reno,* at P. 37:7-25 and 38:1-3.

184.    Agent Reno stated that if a mistake is made the E3 database can be edited,

but when further pressed on that statement, he said that in a case as Mr. Nieves they

would not correct because "There's nothing to correct. The individual was arrested and

apprehended, and that's what it's a record of, and then there's a narrative explaining the

probable cause behind that and what was done, and then it shows that the individual was

put up for charges and that the charges are either accepted or not . . . There would not be

anything to correct, other than if the charges were dropped." *Exhibit 5, Deposition of

Agent Devin Reno,* at P. 43:12-18, and P. 44:17-22.

185.    Agent Reno said that, "Generally, every border patrol agent" has access to

the E-3. *Exhibit 5, Deposition of Agent Devin Reno,* at P. 52:1-2

186.    Asked if to obtain information you input the name and the date of birth, he

said, Yes, "you would have to do a query either for a case number or for a subject."

*Exhibit 5, Deposition of Agent Devin Reno,* at P. 52:3-7.

187.    He said that Border Patrol Agents do not need permission to edit

information, but that "There are limits, based on your position. So, supervisors and above

have more editing privileges than agents," but every border patrol agent has access and

can edit. *Exhibit 5, Deposition of Agent Devin Reno,* at P. 52:12-25, and P. 53:1-3.

188.    Agent Derryberry believed that his case, "[W]as based on a multitude of

things, which included the dog hit, the positive drug test and ultimately the confession.

That's what my case was based on." *Exhibit 8, Deposition of Agent Brian Derryberry* at

P. 29:16-19.

189.    On September 23, 2011, a day after he received a notice from Ms. Kathryn Stevens a senior forensic chemist for DEA lab that there were no drugs in the liquid fluid, Agent Derryberry ordered a re inspection of Mr. Nieves vehicle. *Exhibit 8, Deposition of Agent Brian Derryberry* at P. 30:11-25; 31:1-23.

190.    The re inspection used several methods including canine, fiber optic scopes and additional nonintrusive tools and Agent Derryberry was present. No drugs were found. *Exhibit 8, Deposition of Agent Brian Derryberry* at P. 32:4-9.

191.    On September 14, 2011, eight days before receiving the DEA lab report informing him that there were no drugs, Agent Derryberry testified about Mr. Nieves case before the Grand Jury in Phoenix. *Exhibit 8, Deposition of Agent Brian Derryberry* at P. 33:8-25 and P. 34:1-5.

192.    On October 14, 2011, after Mr. Nieves and his automobile were released, Agent Derryberry contacted the DEA forensic chemist via e-mail asking, "clarification on the 'just water' statement. Was there nothing found as far as drugs are concerned? Was it a hundred percent pure water with no additional additives of any kind? The liquid sample we sent was suspected to be liquid meth after two positive field tests . . .  and was removed from a windshield wiper fluid reservoir, which contained blue foamy fluid.  Please help me to understand.  *Exhibit 8, Deposition of Agent Brian Derryberry* at P. 35:23-25 and 36:1-6.

193.    Asked if he knew that of the two tests conducted one was positive and the other was negative, Agent Derryberry said that he didn't know that. *Exhibit 8, Deposition of Agent Brian Derryberry* at P. 38:19-21.

194.    Ms. Stevens, the DEA forensic chemist, responded, "My tests indicated that liquid was probably water, as opposed to some other solvent.  I tried several different extraction techniques and I found no trace of methamphetamine or any other drug.

"I have tested several liquid methamphetamine samples in the past and the methamphetamine ahs been quite easy to identify.  I am confident that there were no drugs in the sample you submitted.

"I can't say whether other additives were present because I only tested for the presence of drugs.  I'm also not sure why your field tests may have had positive results.  I would need more details.

"If you have any further questions please let me know.  I'm in the office today until four o'clock.  Please feel free to contact me if you like."  Agent Derryberry did not contact her again. *Exhibit 8, Deposition of Agent Brian Derryberry* at P. 39:9-25.

195.    Agent Roden vehemently disagreed that there were no drugs in Mr. Nieves car because his "dog alerted to the odor she was trained to detect on that vehicle . . .she alerted to that vehicle. That's what I know . . .I do not agree [there were no drugs there] because she alerted to odors she was trained to detect on that vehicle . . .  No, I don't agree.  The odor was there.  The odor of something was on that vehicle that caused her to alert. *Exhibit 7, Deposition of Agent Matthew Roden,* at P. 57:7-25 and P. 58:1-7.

196.    When told that when facts change, conclusions also change and the facts have changed in Mr. Nieves case, he said, "the facts have not – the odor was there.  My

Case 4:13-cv-00955-CKJ-LAB   Document 139-1   Filed 07/28/17   Page 45 of 45


dog alerted to odors she was trained to detect and I'll keep saying that over and over. The odors were there . . .She alerted to odors trained to detect.  We couldn't find the source of it but the odors were on that vehicle.  That's period." *Exhibit 7, Deposition of Agent Matthew Roden,* at P. 58:8-24.

197.    Agent Roden tried to get information about the results of the search from members of the disrupt unit to put on his report, "[S]o my do could claim for her statistics. *Exhibit 7, Deposition of Agent Matthew Roden,* at P. 41:17-19.

198.    *Exhibit 12, Dr. Richard A. Leo's expert opinion report, docket number 95.*

199.    *Exhibit 10, Mr. Edward J. Dobbertin's expert opinion, docket number 97.*

200.    *Exhibit 11, Dr. Leo J. Kadehjian's expert opinion report, docket number 98.*

201.    *Exhibit 13, CBP Portal (E3) to Enforce/Ident*

Dated this 24th day of July 2017.



_Jesús R. Romo Véjar_

Jesús R. Romo Véjar
**Attorney for Plaintiffs**

Notice Provided Electronically.