# **EXHIBIT 4**

# Deposition of Agent Victor Casillas

1

1          UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF ARIZONA

3

4

5    ARMANDO NIEVES MARTINEZ, et al. )
                                     )
6        Plaintiffs,                 ) No. 13-955 TUC-LAB
                                     )
7        vs.                         )
                                     )
8    THE UNITED STATES OF AMERICA,   )
                                     )
9        Defendant.                  )
     _____)

10

11

12

13

14

15        VIDEOTAPED DEPOSITION OF VICTOR CASILLAS
                  November 24, 2015
16                 Tucson, Arizona

17

18

19

20

21

22            BARBARA BRODRICK, RPR
            Certified Reporter 50188
23          MEYER, LUMIA & ASSOCIATES
         100 North Stone Avenue, Suite 808
24             Tucson, Arizona  85701
25    Ph (520) 623-1100        Fax (520) 623-2067

12

1      **A     Whenever the last time we met -- I met with**

2   **chief counsel -- and I'm not sure when that was.**

3      Q     This Disrupt Unit is part of a custom and

4   border enforcement?   Border Patrol?

5      **A     Border Patrol.**

6      Q     So the entire name is?

7      **A     Disrupt Unit.**

8      Q     Then United States Border Patrol?

9      **A     Correct.**

10     Q     What is it that you recall about arriving --

11           First of all, do you recall where you were

12   sent to?

13     **A     Sent to -- I'm sorry.   By whom?**

14     Q     When you received a phone call you were told

15   the location of the traffic; is that right?

16           MR. BUTLER:   Objection.   Form and foundation.

17   You can go ahead.

18           THE WITNESS:   I have some questions -- I'm --

19           MR. BUTLER:   You'd like to talk to me off the

20   record?

21           THE WITNESS:   Yes.

22           MR. BUTLER:   Can we go off the record?

23           THE VIDEOGRAPHER:   Off record at 10:52.

24           (Recess)

25           THE VIDEOGRAPHER:   Back on the record at

14

1    narcotics.

2        Q    You had information that there will be a

3    vehicle?  Is that what you're saying?  Or that there

4    was a vehicle?

5        A    Would be a vehicle coming.

6        Q    So you were expecting a vehicle with a hidden

7    compartment?

8        A    Correct.

9        Q    And you recall how long before --

10           Was it on the same date, on the 18th, that you

11   received that information?

12       A    We started receiving information on this the

13   day prior.

14       Q    And so you were -- by "you," I mean places

15   where the people were stopped, they were on the lookout

16   for that kind of a vehicle?

17       A    Correct.

18       Q    And did you get a description of the vehicle?

19       A    Yes.

20       Q    What was the description?

21       A    Our information was that it would be a family

22   unit, Sonoran plated SUV, possibly an Expedition.  Not

23   certain.

24           MR. ROMO:  Just to make sure, I don't have

25   that information.

15

1          MR. BUTLER:  You have all the information we

2     have.  Everything that you have asked for we produced.

3          Q   (By Mr. Romo)  You began receiving that the

4     day before; is that correct?

5          **A   Yes.**

6          Q   In addition to the phone call about

7     Mr. Nieves, did you get any other phone calls about any

8     other car that was stopped?

9          **A   No.**

10         Q   His was the only car that met this

11    specification?

12         **A   Yes.**

13         Q   And the source that gave you that information,

14    has that source been a reliable source?  Given you

15    information before?

16         MR. BUTLER:  I'm going to put an objection in

17    here.  You're getting into law enforcement sensitive

18    information regarding the source.  As you can probably

19    expect, sources for law enforcement identity --

20         MR. ROMO:  I'm not asking for identity;

21    whether or not it was a reliability source.

22         MR. BUTLER:  I'll allow that question, but if

23    you get into too specific stuff we'd have to hash that

24    out.

25         MR. ROMO:  I won't.  Don't worry about it.

17

1    checkpoints or from the Ajo station and you don't

2    recall that at this point?

3        **A    Correct.**

4        Q    I have a couple of reports here.  I'll show

5    them to you just so you can maybe take a quick look at

6    them.

7            MR. BUTLER:  Do you want these to be exhibits?

8            MR. ROMO:  No.  Just to refresh his

9    recollection.

10       **A    Okay.**

11       Q    (By Mr. Romo)  As you can see, your reports

12   are not too detailed, right?  But there was another

13   agent called Derryberry; do you remember him?

14       **A    He was HSI.**

15       Q    I'm sorry?

16       **A    Yes.  He's with ICE.  HSI.**

17       Q    Were you reporting to -- some of the stuff

18   with Agent Derryberry?

19       **A    What do you mean "reporting to"?**

20       Q    I notice that Agent Derryberry says that he

21   received phone calls from you, or from Carson, telling

22   him what was going on.

23       **A    Okay.**

24       Q    Were you telephoning him; do you recall

25   telephoning him?

18

1       A    I was not.

2       Q    Was there a joint operation -- at some point

3   did it become a joint operation with ICE?

4       A    Yes.   We were working this information along

5   with HSI.

6       Q    Along with who?

7       A    ICE.   HSI.   Agent Derryberry.

8       Q    So the operation had started the day before it

9   joined you?

10      A    Yes.

11      Q    In addition to what you have told me, the

12   information that you had, were you told what kind of

13   drugs would be coming through on that date?

14      A    No.   The information we had was that it would

15   be hard narcotics.   Nonspecific.

16      Q    And what is your understanding of "hard

17   narcotics"?

18      A    Cocaine, heroin, meth.

19      Q    Do you recall now when you received the phone

20   call?

21      A    What do you mean?

22      Q    After reading your report?

23      A    No.   Again, I'm not sure -- there were many,

24   many phone calls.   I'm not sure what specific phone

25   call you're asking about.

19

1    Q    That's fair.  What kind of phone calls do you

2    receive regarding this incident -- only this incident?

3    **A    Back and forth with Carson regarding updates**

4    **on the information he was learning.  Back and forth on**

5    **what time we would be going in.  Stuff like that.**

6    Q    And do you recall what time you would be going

7    in?

8    **A    I do not.**

9    Q    But at some point someone was stopped,

10   correct -- at the checkpoint?

11   **A    Correct.  Every vehicle is stopped at the**

12   **checkpoint.**

13   Q    I imagine that every vehicle that stops at a

14   checkpoint didn't meet this criteria, right -- that you

15   had been provided?

16   **A    Correct.**

17   Q    And Mr. Nieves' vehicle met that criteria; is

18   that correct?

19   **A    Yes.**

20   Q    And it was stopped?

21   **A    As were all vehicles, yes.**

22   Q    And it was searched?

23   **A    It was -- the canine was run.  And again, the**

24   **canine operates at the checkpoint and it -- the handler**

25   **runs his dog through many different vehicles, so --**

20

1              It was only searched after the dog alerted.

2       Q    So who had the information about this vehicle

3   and what -- and the criteria of the vehicle, in

4   addition to you and Agent Carson?

5       A    My team.

6       Q    All of your team?

7       A    Correct.

8       Q    All of your team was with you?

9       A    No.  Not directly with me.  We were all

10  working.

11      Q    Were there any members of the team at the

12  checkpoint?

13      A    Yes.

14      Q    Do you recall who they were?

15      A    No.

16      Q    How many members were there --

17      A    Again --

18      Q    -- at the checkpoint?

19      A    I do not recall.

20      Q    More than one?

21      A    I know I was there.  I do not recall who else

22  was there.

23      Q    When you have information like this, you

24  obviously want to catch the drugs, you want to make

25  sure that they don't go through.

21

1          MR. BUTLER:  Form.

2     Q   (By Mr. Romo)  Is that correct?

3          MR. BUTLER:  You can answer.

4     **A   Yes.**

5     Q   (By Mr. Romo)  The people that are at the

6   checkpoint, are they notified as to what kind of

7   vehicle they should be looking for?  By the "people," I

8   mean the agents.

9     **A   We did not give them all the information.**

10    Q   What kind of information did you give them?

11    **A   We notified them, and I don't recall exactly**

12  **what information, but something to the effect of we**

13  **were expecting a vehicle possibly containing hard**

14  **narcotics in a hidden compartment.**

15    Q   Without specifying what kind of vehicle?

16    **A   Yes.**

17    Q   I'm sure this happens a lot, right -- at the

18  checkpoints and at the border?

19    **A   The drugs or --**

20    Q   The input -- drugs being brought into the

21  United States, information that you have that drugs

22  will be coming in at some point to the United States

23  with a specific vehicle.

24    **A   Yes.  We receive a lot of information about**

25  **drugs coming in.  Not all of them are small amounts in**

28

1      Q    But in one corner of it is a holding cell?

2      **A    Correct.**

3      Q    And the other is your offices?

4      **A    Yes.**

5      Q    The offices of the agents that are there?

6      **A    Yes.**

7      Q    When you received your phone call, what did

8  you do?

9      **A    Which phone call?**

10     Q    Regarding the Nieves stop.

11     **A    Can you be a little more specific?**

12     Q    There were no other phone calls that Agent

13  Carson or anybody else called you about regarding an

14  automobile that met the criteria that you were looking

15  for, correct -- except Nieves -- on the 18th?

16     **A    So -- I apologize.  I'm not understanding**

17  **exactly what you're --**

18     Q    You were looking for a specific SUV, right?

19     **A    Yes.**

20     Q    And you only received one phone call that met

21  those specifications from Agent Carson or anyone else?

22     **A    When we received it, it had entered or the**

23  **suspected, or vehicle matching our criteria, it was --**

24  **one of my guys was further south parked by the border**

25  **by the POE.**

29

1     Q    Was that before or after the first checkpoint?

2     **A    Before.**

3     Q    Before the first checkpoint?

4     **A    Correct.**

5     Q    And he advised you that there was such an SUV

6  coming in?

7     **A    Yes.**

8     Q    Why wasn't the SUV stopped at the first

9  checkpoint?

10     **A    I do not recall.**

11     Q    But it would be in your report?

12     **A    I wouldn't know about that.**

13     Q    Generally you put everything in the report,

14  right?  "I got a phone call from Agent Roman who tells

15  me that there is an SUV that meets the specifications"?

16     **A    Our reports -- it's pretty much a -- this is**

17  **pretty much what happened.  It would be impossible to**

18  **go into detail as to everything that we did that day.**

19     Q    It's pretty general; is that what you're

20  saying?

21     **A    Uh-huh.**

22     Q    That would be yes?

23     **A    I wouldn't call it general, but yes, to what**

24  **you're asking for.**

25     Q    The first checkpoint -- how far is it from the

31

1      **Patrol.  I was wearing plain clothes that day.**

2          Q    Did you advise any of the agents that they

3      were looking for this car?

4          **A    Again, they knew we were set up for something;**

5      **they did not have specifics.**

6          Q    But you did have specifics that this truck was

7      just coming through the second checkpoint, right?

8          **A    (Witness nods head.)**

9          Q    Did you tell them, "Hey, look, there's an SUV

10     coming in and you need to be on the lookout"?

11         **A    I don't recall if I again went into specifics**

12     **as to make, model of vehicle.  Me being there they made**

13     **assumptions.**

14             **If I recall, I did -- what's the word I'm**

15     **looking for -- confirm to them that, yes, we are**

16     **working traffic.**

17         Q    When you gave them information, even if you

18     didn't give them make, model of the vehicle, did you

19     give them a vague idea of more or less what the vehicle

20     looked like?

21             MR. BUTLER:  Objection.  Form and foundation.

22     You can answer.

23         **A    No.  Again, it was -- we -- and this -- I just**

24     **recalled the reason why -- one of your earlier**

25     **questions why we set up at the second checkpoint.  The**

1  primary reason was because that was the checkpoint that

2  had the canine dog.

3          So for us, we were going to let the dog

4  confirm our information and do its work.

5      Q    (By Mr. Romo)  So did you talk to the canine

6  agent?

7      A    Again, I do not recall specifics.  They knew

8  that we were expecting something and Disrupt Unit goes

9  and, hey, we're at the checkpoint.  They understand

10  what the Disrupt Unit does, so --

11      Q    So they know something is coming up?

12      A    Yes.

13      Q    In addition you had given them information

14  that something was coming up?

15      A    I do not remember what information I gave

16  them.

17      Q    Do you recall where you were when the car

18  showed up?

19      A    I know I was at the checkpoint, but exactly

20  where, no.

21      Q    Did you see the car right away?

22      A    I do recall seeing as it approached.

23      Q    As it approached the checkpoint?

24      A    Correct.

25      Q    And what did you do?

36

1     Q    Do you recall placing the mom and the daughter

2  and the young man at the trailer with a cell?

3     **A    Again, I do not recall exactly where each**

4  **person was placed.**

5     Q    To be sure, at this point you're in charge of

6  the case?

7     **A    In what aspect?  I'm not sure.**

8     Q    At the checkpoint you're in charge of the

9  case?

10    **A    So I'm taking the case.  I wouldn't say that I**

11 **was in charge at the checkpoint.**

12    Q    Were you coordinating with anyone?

13    **A    Anyone at the checkpoint?  Or are you**

14 **referring to HSI or my unit?**

15    Q    Were you coordinating with anyone at the

16 checkpoint?

17    **A    There was many things going on at once.  Once**

18 **the dog alerted I notified my team and everybody**

19 **started moving.**

20         **What everyone did, I'm not sure.**

21    Q    And by that "moving," you mean they came to

22 the site?

23    **A    Again, I would imagine -- and I'm not certain**

24 **on this -- that if there was already somebody out there**

25 **from my team we were the ones taking them, and if not,**

1    somebody came up.

2        Q    You mean to transport them?

3        A    Correct.

4        Q    Somebody from your team?

5        A    Yes.

6        Q    And then were you coordinating with other

7    agents there at the checkpoint?

8        A    Obviously at that point we notified them and

9    made them aware that we would be processing this case.

10       Q    Did you notify ICE?

11       A    I do not recall if I -- I don't think I

12   personally notified them.  I know that they were

13   notified.

14       Q    Did anyone show up?

15       A    Not till later.

16       Q    What time?

17       A    I do not recall what time.

18       Q    You said that you transported them.  Where did

19   you transport them to?

20       A    To the Ajo station, Border Patrol station.

21       Q    How far is that?

22       A    From mile marker 18 to -- the station is mile

23   marker 54.  I might be off on that.  It's been a while.

24       Q    Like 36 miles?  Something like that?

25       A    I'd have to check.  I'm sorry.

1      Q   So --

2      A   **With Mr. Nieves' vehicle, obviously because it**

3   **was a hidden compartment, we needed to --**

4      Q   Take it apart?

5      A   **-- take the narcotics out.  So it was brought**

6   **into the garage.**

7      Q   The garage has all the equipment to dismantle

8   an automobile?

9      A   **Yes.**

10     Q   Are there experts in that area that do that?

11     A   **They're certified mechanics.**

12     Q   They're in charge of dismantling?

13     A   **Correct.**

14     Q   Do you have any idea what time it is now?

15     A   **Which part?**

16     Q   When you arrived at the station.

17     A   **I'm going to say roughly 45 minutes, maybe.**

18     Q   From 9:15?

19     A   **Yes.**

20     Q   So about 10 o'clock?

21     A   **Roughly.**

22     Q   And you said the automobile was taken to the

23   garage?

24     A   **Correct.**

25     Q   What happened to the suspects?

63

1    Q   (By Mr. Romo)  So you have this information

2   from the son.  What did you do with it?

3    **A   I allowed him to go speak with his father.**

4    Q   So you didn't allow Mrs. Nieves to speak with

5   the father?

6    **A   No.**

7    Q   Let me proceed with this, okay?  "Agents

8   allowed Nieves Martinez to speak with his wife and son

9   in a vacant room with the door open and agents standing

10   at the door"; do you recall that?

11   **A   No.**

12   Q   You and Falette allowed my client to meet with

13   his wife and his son; do you recall that?

14   **A   No.**

15   Q   "During the conversations agents heard Nieves

16   Pesquera tell his father that it was time to be a man

17   and step up"; do you remember that?

18        MR. BUTLER:  Objection.  Form and foundation.

19   **A   Couple things on that.  You keep on**

20   **referencing "agents."**

21   Q   (By Mr. Romo)  That's what it says here.

22   **A   Just -- I did not allow the mom and dad to**

23   **speak.  If that ever happened, it was not me**

24   **authorizing that.**

25        **I do, now going back to the conversation with**

3df64eb9-16bc-4b8d-871d-6ba379eaa530

64

1    the son and the father, I vaguely remember -- and one

2    of the -- what's the word I'm looking for -- things

3    that I asked of the son if I were to allow him to speak

4    with his father was that I needed to be present or in

5    the immediate area.

6              And he acknowledged.

7              So when they were speaking they kept on trying

8    to whisper, and so I wasn't able to listen or hear the

9    entire conversation.

10       Q    So there were two meetings?

11       A    Again, the one meeting that I am aware of is

12   the one that I'm telling you about.

13       Q    It's possible that Falette allowed this

14   meeting between the wife --

15       A    I don't know.

16       Q    Would you not be notified?

17       A    Again, there was a lot of stuff going on.

18       Q    Is Falette part of your team?

19       A    Yes.

20       Q    And you were his supervisor?

21       A    Correct.

22       Q    Would he act without your knowledge?

23            MR. BUTLER:  Objection.  Form and foundation.

24       A    There was a lot of stuff that needed to be

25   done.  There's not a procedure for either one of those.

65

1     Q    (By Mr. Romo)   Agent Derryberry says that this

2  meeting took place, my client says it took place and

3  his wife says it took place and the son says it took

4  place, but you don't remember it?

5     **A    I know that in my presence that did not**

6  **happen.**

7     Q    Then he says that there were some statements

8  that were made by my client there at the Ajo station.

9  Do you recall the statements?

10    **A    I'm not sure what statements you're referring**

11 **to.**

12    Q    Well, I think you characterize that as an

13 admission or a confession.

14    **A    By the son?**

15    Q    By the father.

16    **A    Yes.**

17    Q    And there were only a couple of things that he

18 said at the station, correct?

19    **A    There were a few.**

20    Q    He says that he took the Expedition to be

21 repaired in Caborca, Mexico, to get some work done; do

22 you recall that he said that?

23    **A    That I said that?**

24    Q    That he said that.

25    **A    He at one point told us that, yes.**

67

1      A    I don't know about the exact time, but they

2   were released that night.

3      Q    And my client was sent over to Agent

4   Derryberry, right?

5      A    Correct.

6      Q    And he was then transported to Phoenix?

7      A    Yes.

8      Q    What's OCDETF task force?

9      A    Task force.  Just it's just another --

10  comprised of different agencies.

11     Q    Then on the way to Phoenix you went with them,

12  right -- with Derryberry?

13     A    Correct.

14     Q    And who else was there?

15     A    Agent Carson.

16     Q    And who else?  Was that it?

17     A    Derryberry.

18     Q    So Derryberry, you and Carson.  Nobody else?

19     A    Correct.  Your --

20     Q    My client?

21     A    Correct.

22     Q    And on the way there my client says that again

23  he was threatened with his wife.  His wife had already

24  been released in Why, Arizona; do you recall that?

25     A    I was told that she was to be released.  I was

69

1    take place -- the exchange, correct?

2           MR. BUTLER:  Objection.  Form.

3      **A    He did tell me that he was to --**

4      Q    (By Mr. Romo)  Where did he tell you that?  On

5    the car on the way to Phoenix, correct?

6      **A    No.  After he confessed he told me that he was**

7    **to park the vehicle at the Chandler Mall.  They were to**

8    **go shopping and a couple hours later the vehicle would**

9    **be back empty.**

10     Q    How much would he be paid?

11     **A    An additional $7,000.**

12     Q    Well, it says that that information was

13   provided on the way to Phoenix actually.  My client

14   says that he was threatened on the way to Phoenix, that

15   you will have someone pick up his wife at Why and bring

16   her back unless he gives you the information and she

17   will be sent to Kentucky and the child would be given

18   to the State of Arizona or the federal government as a

19   juvenile who was without parents; do you recall that?

20          MR. BUTLER:  What says that?  Is that what

21   your client says or the document you're referring to

22   that says that?  You said "it."

23          MR. ROMO:  It was it.

24          MR. BUTLER:  The document says that?  Is that

25   what you're saying?  I don't understand your question.

3df64eb9-16bc-4b8d-871d-6ba379eaa530

70

1     Q   (By Mr. Romo)  The document says that the

2  information that you just gave me was provided on the

3  way to Phoenix, and there was actually $5,000, not

4  $7,000 that he was -- he would be paid in Phoenix.

5       My client says:  I said all those things.  I

6  didn't know what to say because Casillas was

7  threatening me in saying that if I didn't say that

8  Casillas --

9       And who was driving the car?

10     MR. BUTLER:  Objection.  Form.

11   **A**   **Derryberry.**

12    Q   (By Mr. Romo)  And Derryberry said:  If I

13  didn't say that I would be -- my wife would be brought

14  back from Why and my daughter would be taken into

15  custody and given to the federal government.  She would

16  be taken away from me and my young man would be taken

17  into custody as well and sent to jail; do you recall

18  that?

19     MR. BUTLER:  Objection.  Form and foundation.

20    Q   (By Mr. Romo)  Saying those things to him on

21  the way to Phoenix?

22   **A**   **Absolutely not.**

23     **(Exhibit No. 2 marked for identification.)**

24    Q   I'll show you what has been marked as Exhibit

25  2.

1          Do you recognize that Exhibit 2 as your

2     handwriting?

3          **A    Yes.**

4          Q    And would you read it, Exhibit 2, please?

5          **A    Sure.   "Taller Rascon in Caborca.   Antonio**

6     **Sanchez Rascon about 48 years old.   Antonio, Tony,**

7     **Rascon, red head.   He is son of Antonio Sanchez.**

8          **"Tony was going to pick up Expedition in**

9     **Chandler Mall.   He has spare key.   He was told to go**

10    **shop and they would return SUV back to same spot.**

11         **"Senor Antonio told him --"**

12         **I can't understand my handwriting.**

13         Q    "Instruction"?

14         **A    -- "instructions.   He was to get paid 10K.   He**

15    **was already paid 5K of which 3K was what he had on him**

16    **at time of arrest."**

17         Q    And the report for Agent Derryberry states

18    exactly the same thing, that on the way to Phoenix

19    while he had custody of this suspect, you and

20    Casillas -- I mean Brendon Carson --

21         He's also a supervisor?

22         **A    No.**

23         Q    -- questioned Mr. Nieves Martinez and he

24    provided the information you just read:  One, that the

25    repair shop in Caborca was named Taller Rascon; two,

78

1     Q    (By Mr. Romo)   As we sit here it's been four

2     years, right?

3         **A    Correct.**

4     Q    My client, as I said, was released.   He spent

5     40 days in jail.   It turns out that the methamphetamine

6     was not methamphetamine.   In your mind now was he

7     guilty of something?

8         **A    Yes.**

9     Q    And what was that?

10        **A    Transporting meth.**

11    Q    He was guilty of transporting meth?

12        **A    Based on the evidence that I had.**

13    Q    But you already know that the meth was not

14    meth.

15        **A    I know that the sample taken tested**

16    **inconclusive or with no meth on it.**

17    Q    Actually it doesn't say it tested

18    inconclusive.   It said it was not meth.

19         Does that make you change your mind that he

20    was transporting meth?

21        **A    I had the information that I did, and that's**

22    **what the determination I came up with based on the**

23    **information and evidence that I had.**

24    Q    Is that still part of your reports?   Do you

25    have any report that says he was transporting meth?

79

1     A    Whatever you have is what we have.

2     Q    Did you provide a report to anyone?

3     A    Which report are you talking about?

4     Q    Your report that said he was transporting

5  meth.

6     A    I inputted it into the system.

7     Q    What kind of system is that?

8     A    That's going into our databases.  It's called

9  E3.

10    Q    D as in dozen?

11    A    E.

12    Q    E as in echo?

13    A    Correct.

14    Q    Describe that, please.

15    A    The system?

16    Q    What you do.  What you do.

17    A    An event is created for each incident, and

18  from that event all agents with access can go in to

19  pull up the event and input the information.

20    Q    Where does that go?

21    A    I don't know.  What do you mean?

22    Q    The information.

23    A    Where does it go?  You're talking -- you're

24  asking questions -- I'm not an  IT guy.  I'm not sure.

25    Q    Suppose my client comes back and you see him

3df64eb9-16bc-4b8d-871d-6ba379eaa530

80

1    again or another agent sees him and looks at the visa

2    he's got.  Can he go into the E3 or the information

3    would be there so it would say:  Look, this guy was

4    picked up for methamphetamine?

5              MR. BUTLER:  Objection.  Form and foundation.

6         **A    No.   E3, one may contact with -- to go with**

7    **your example, your client would not have access right**

8    **there into E3.**

9         Q    (By Mr. Romo)  The agent.  Not my client.

10        **A    The agent would not have access to E3 right**

11   **there and then.**

12        Q    Would that E3 information be provided to

13   that -- so that when he crosses again that information

14   would be there?

15             MR. BUTLER:  Objection.  Form and foundation.

16        **A    E3 is a database.  One has to go enter.  One**

17   **has to known the event number to be able to locate that**

18   **event.   There are I presume millions of events in that**

19   **system.**

20        Q    (By Mr. Romo)  And I understand that, but my

21   client was picked up for methamphetamine.  You still

22   think he had methamphetamine, correct?

23        **A    Yes.**

24        Q    And your thoughts were relayed to the input

25   that you put into your database, correct?

81

1       **A    I typed up my report and submitted it.**

2       Q    Into the database?

3       **A    Correct.**

4       Q    If you think that he had methamphetamine, can

5    anyone check it out and see your thoughts?

6            MR. BUTLER:  Objection.  Foundation.

7       Q    (By Mr. Romo)  Casillas thought he had

8    methamphetamine so I better check him out.

9       **A    Not through E3, no.  E3 is just what happened.**

10   **It's not anything else.**

11           **What you're referencing or referring to as my**

12   **thoughts is the report that was typed up.  What**

13   **happened.  The facts, not what Victor Casillas thinks.**

14      Q    Would anyone else have access to this

15   information other than by E3?

16           MR. BUTLER:  Objection.  Form and foundation.

17      **A    No.  Again, that information is inputted into**

18   **that event or that database and one would have to, one,**

19   **have access to it and then be able to pull it up by**

20   **event number.**

21      Q    (By Mr. Romo)  If my client tells someone --

22   an officer -- "I was arrested on August 18, 2011, and I

23   was accused of having methamphetamine," would they be

24   able to go into E3 and pull it up?

25           MR. BUTLER:  Form and foundation.

82

1     Q    (By Mr. Romo)   The agent; not my client.

2     **A    Yes, theoretically.   Just because one is given**

3  **that information it's highly unlikely, but to go play**

4  **along here, theoretically he would be able to query**

5  **your subject by his name in this database.**

6     Q    In the database?   And the database is shared

7  by Homeland Security?

8     **A    Border Patrol.**

9     Q    Border Patrol, and who else?

10    **A    I'm not sure if it's linked with customs.   I**

11 **know obviously Border Patrol.**

12    Q    And the Department of State?

13    **A    No.**

14    Q    The Department of State would be able to

15 check, wouldn't they, if there's anything in the

16 records that would show that my client is trying to get

17 a visa --

18         MR. BUTLER:   Objection.   Foundation.

19    Q    (By Mr. Romo)   -- it would show any arrests?

20         MR. BUTLER:   Objection to form and foundation.

21    Q    (By Mr. Romo)   If you know.   Don't speculate.

22    **A    No.**

23    Q    Do you know what E3 stands for?

24    **A    No.**

25    Q    It sounds like --

85

1    **A    Yes.**

2    Q    So the agents doing the normal routine stops

3    on the road were not part of the disrupt team, correct?

4    **A    Yes.**

5    Q    And the canine handler at the checkpoint, was

6    he part of the disrupt team?

7    **A    He was not.**

8    Q    Were any of those agents aware of what you

9    were looking for, what SUV you were looking for based

10   on the intel you had before they showed up?

11   **A    No.**

12   Q    Did you tell them at any time:  Hey, an SUV

13   with this description is coming down the road, we're

14   going to be making a stop, or anything along those

15   lines?  Did you make a comment like that to them?

16   **A    No.**

17   Q    Why not?

18   **A    When doing our operations, we always do our**

19   **operations in a form where it will be easier for**

20   **attorneys to interpret, and checkpoint -- perfect**

21   **example of why we didn't pull it over prior to it**

22   **arriving at the checkpoint.**

23   **No notifying the agents that they assigned to**

24   **it, is -- they were doing their normal duties.  They**

25   **were operating in their own capacity without prior**

86

1      **knowledge or information from what I had.**

2          Q    Canine checks of vehicles, are those routine

3      incidents of every vehicle that comes through the

4      checkpoint?

5          **A    Yes.**

6          Q    Did you see -- let me ask you this first:  Are

7      you aware of what a canine does when it alerts?

8          **A    No, would be the short answer.**

9          Q    Are you sort of depending on what the handler

10     of the canine says is an alert?

11         **A    Yes.**

12         Q    And that canine handler says this canine

13     alerted at the stop?

14         **A    Yes.**

15         Q    And they sent the vehicle to secondary,

16     correct?

17         **A    Correct.**

18         Q    And that is when you came on to the scene and

19     announced your presence and sort of got involved in the

20     investigation, correct?

21         **A    Yes.**

22         Q    At some point the canine alerted again; is

23     that correct?

24         **A    Yes.**

25         Q    And at that point did you have probable cause

# **EXHIBIT 5**

Deposition of Agent Devin Reno

1

1     IN THE UNITED STATES DISTRICT COURT

2      DISTRICT OF ARIZONA

3

4

5 Armando Nieves Martinez,   )
  et al.,         )

6            )

    Plaintiffs,    )

7            )

    vs.       ) No. 13-955 TUC-LAB

8            )

  The United States of America, )

9            )

    Defendant.    )

10           )

11

12

13

14

15     DEPOSITION OF DEVIN RENO

      December 8, 2015

16       9:42 a.m.

      Tucson, Arizona

17

18

19

20

21

22

     MARY MEYER, R.P.R.

23    Certified Reporter 50225

    MEYER, LUMIA & ASSOCIATES

24  100 North Stone Avenue, Suite 808

    Tucson, Arizona 85701

25  Ph (520) 623-1100 Fax (520) 623-2067

14fd4c35-7f75-40f1-877b-696d7718905d

10

1       Q.   Well, generally, you were assigned from early in the

2   morning until late in the afternoon, right, in the Disrupt

3   Unit?

4       **A.   Shifts varied.**

5       Q.   Right, but in the dayshift.

6       **A.   That day I believe we were, yes.**

7       Q.   Okay.  And do you recall specific instructions

8   regarding that day?

9       **A.   So, if I remember correctly, Mr. Casillas had us come**

10  **in and meet with him first thing in the morning related to**

11  **some possible intel that he had for us to work.**

12      Q.   Okay.  So he related to the entire unit what was

13  going on?

14      **A.   Correct.**

15      Q.   All right.  And then do you recall where you went

16  after that?

17      **A.   Where I went after what?  After he --**

18      Q.   After the briefing.

19      **A.   I believe that I got -- I was assigned, and I cannot**

20  **remember the guy's name off the top of my head, but we were**

21  **posted at State Route 85 and State Route 86 in the town of**

22  **Why.**

23      Q.   And the intel concerned specific CI information about

24  an automobile that was to come through, is that correct?

25      **A.   Yes.**

11

1    Q.   And did they give you a description of the

2  automobile?

3    **A.   Description that we had was that it would be a gold**

4  **or tan SUV, it would be Sonoran plated, and that there would**

5  **be a family unit.**

6    Q.   And I notice you are very specific in your knowledge

7  of that.   Did you have a report that you looked at?

8    **A.   That I looked at?**

9    Q.   Um-hum.

10   **A.   I went over the case with my attorneys.**

11   Q.   So when you went over the case, did they refresh your

12  recollection?

13   **A.   No.**

14   Q.   Do you have a report?

15   **A.   I do not.**

16   Q.   And why didn't you do a report on that day?

17   **A.   I was on the periphery of most of this case.   I**

18  **didn't have any direct involvement with the questioning.   I**

19  **didn't make a vehicle stop.   And, at the time, it's not**

20  **necessarily always policy for us to have every agent involved**

21  **write a report.**

22   Q.   All right.   As I have questioned you, your memory has

23  been hazy about the date, the time, the shift, but you were

24  very clear with regard to the automobile description.   How do

25  you account for that?

13

1      A.  So, I was assigned to 85 and 86 to look for a vehicle

2  that matched that description.

3      Q.  Right.  And then?

4      A.  So, we were to call out amongst the group, anybody

5  who saw a vehicle that may or may not have matched that

6  description.

7      Q.  Okay.  And then?

8      A.  If we saw it, we would report it.  Vic would go,

9  would let us know if that intelligence, or if what we had told

10  him was verified with his intelligence.  And then, from there,

11  the idea was to allow the vehicle to go to the checkpoint.

12      Q.  And at some point did you see the vehicle?

13      A.  I'm not a hundred percent sure that I saw that actual

14  vehicle as it passed my location.  We called out a number of

15  vehicles that day.  I'm not sure if I saw that exact vehicle

16  pass my location or not.

17      Q.  Now, if you come in -- you say you called up a number

18  of vehicles that day?

19      A.  Um-hum.

20      Q.  Meaning that a number of vehicles fit that

21  description --

22      A.  Correct.

23      Q.  -- on that particular day?

24      A.  Um-hum.

25      Q.  And when you say "a number," would that be three,

14

1  four, five?

2      A.  Uhm -- I think around five.  I don't know the exact

3  number, no.

4      Q.  All right.  And as I was asking you, in that location

5  at Why, what are the roads that cross that area from the

6  border?  Is there a specific single highway, or are there more

7  than one road?

8      A.  So, that cross the border itself?

9      Q.  No.  Well, if you are sitting in Why --

10     A.  Um-hum.

11     Q.  -- and a vehicle comes through, would it be coming

12  exclusively from the border, or could there be more, other

13  areas where they would be intersecting as well at Why?

14     A.  The only other locations on 85 south of Why that

15  somebody may have been, may have gone to, would have been the

16  Organ Pipe Cactus National Monument or the unincorporated town

17  of Lukeville, which is where the border crossing actually is.

18     Q.  All right.  Now, the Organ Pipe goes directly to the

19  border, right?

20     A.  The land does abut the border, correct.

21     Q.  And the roads that abut the Organ Pipe National

22  Monument, they go to the border, right?

23     A.  Are you asking if there's a direct route from the

24  border to my location?  Or what are you asking me?  I'm not

25  understanding your question.

19

1    description, correct?

2         A.   I wouldn't say -- well, we estimated about five.

3         Q.   Right.  You said "a number" before.

4         A.   I may have.

5         Q.   So, after you saw those vehicles, what happened?

6         A.   I called out that I saw a vehicle that I thought

7    matched the description to the team, and waited for Vic

8    Casillas to verify whether or not that matched his intel.

9         Q.   And was there someone with you?

10        A.   There was.  I can't think of his name off the top of

11   my head right now.

12        Q.   All right.  And did you get any information back from

13   Casillas at some point?

14        A.   Yeah.  Yes.  Vic was -- Vic was updating us with

15   possible timeframes or that now might be a good time to look,

16   or he would come back and say, no, that's -- that's not it.

17   It just depended on what we were telling him at the time.

18        Q.   All right.  And at some point, at some point, did --

19   did he tell you, yeah, this is it?

20        A.   Not --

21             MR. BUTLER:  Object to form.  You can answer.

22        A.   Not -- okay.  Not based on something that I called

23   out, no.  He told us at some point that the vehicle was

24   approaching the checkpoint and that we needed to come up there

25   to assist.

37

1       Q.   (By Mr. Romo)   Okay.   So all of that is input into

2   the E3.   You called it E3, echo three, is that right?

3       **A.   So, we don't input immigration record.   You've**

4   **confused me again.   What are you asking that we put in E3?**

5       Q.   The biographical information you put into the E3 --

6       **A.   Correct.**

7       Q.   -- anything that is with the biometrics, including

8   fingerprints, photographs, that goes into the E3 --

9       **A.   Correct.**

10      Q.   -- and that gets matched with whatever records they

11   have, criminal records or immigration records or any other

12   sort of records.

13      **A.   I don't know what you mean by "they," but if there's**

14   **a criminal or an immigration record that matches the name,**

15   **date of birth, then that's going to pop up, and it's our**

16   **responsibility to ensure that that name, that date of birth**

17   **and any picture that accompanies that matches the person that**

18   **we have in custody.**

19      Q.   And then, as you generate reports, you make sure that

20   those reports are appended to the E3 information you

21   originally obtained?

22      **A.   You're asking me or you're telling me?**

23      Q.   I'm asking you, sir, all the time.   I don't know.

24      **A.   Well, I don't assume questions.**

25          **So, it depends on the case, it depends on what's**

38

1    going on.  But in this particular case, yes, a report would

2    have been done in E3 and attached to that particular file,

3    correct.

4         Q.  And what is E3?  What do you call E3?

5         A.  E3 is E3.

6         Q.  And what does that mean?

7         A.  Its name is E3.

8         Q.  And is it an acronym?

9         A.  I don't know.

10        Q.  You've always known it as E3?

11        A.  Prior to that it was something called Enforce.

12        Q.  And so everyone that comes in contact with you all in

13   similar situations to this gets put into the E3?

14        A.  That's very general.  I don't understand what you're

15   asking me.

16        Q.  Well, Mr. Nieves got stopped with his family because

17   you had information from CI that he was carrying drugs?

18        A.  That's correct.

19        Q.  The original -- well, at the checkpoint, the canine

20   alerted, but the original information you had was that he was

21   carrying drugs, right?

22        A.  Correct.

23        Q.  All right.  And then he was read his rights.  He was

24   taken to the main station, which was in Ajo, so that the car

25   could be searched and he be questioned, correct?

14fd4c35-7f75-40f1-877b-696d7718905d

39

1      **A.   Yes.**

2      Q.   All right.   At that point is when the information

3   began to be inserted into the computer, into what you call the

4   E3?

5      **A.   Correct.**

6      Q.   Now, anyone who has a similar contact would be

7   inputted into the E3, is what I'm asking.

8      **A.   So, if we have what we believe is probable cause, and**

9   **we're making an arrest or an apprehension, yes, that**

10  **individual should be put into E3.**

11     Q.   All right.   Now, suppose the information turns out to

12  be incorrect, as it was in this case, do you know --

13     **A.   Go ahead.**

14     Q.   You disagree that it was incorrect?

15     **A.   I don't understand what you're saying.   You made two**

16  **statements there that don't have a foundation to anything that**

17  **we've talked about so far, so I don't understand.   What was**

18  **incorrect?**

19     Q.   He had no drugs.   Are you aware of that?

20     **A.   I'm aware that a test came back negative.   Not the**

21  **test that we performed.**

22     Q.   So you believe your test rather than the scientific

23  test done by DEA?

24         MR. BUTLER:   Objection, form.

25     Q.   (By Mr. Romo)   Go ahead and answer.

40

1      A.   I'm not saying that one way or the other.   I'm

2   telling you that we ran a test, and the test came back

3   positive.

4      Q.   And as far as you're concerned, he had drugs?

5      A.   Yes.

6      Q.   And if a later test turns -- a later, not a field

7   test, but rather a test done in a lab scientifically, shows

8   that he had no drugs, does that change your understanding of

9   what happened?

10         MR. BUTLER:   Objection, form.

11     A.   My understanding of what happened?

12     Q.   (By Mr. Romo)   Yes, sir.

13     A.   No.   Based on everything that I knew at the time,

14   based on the canine alert, based on the intelligence that we

15   received, and based on the test that we performed, at that

16   time, I believed that he had narcotics in that vehicle.

17     Q.   And I'm not second-guessing your beliefs.   All I'm

18   saying to you is you do have information that the tests

19   performed in a lab were negative, correct?

20     A.   I was verbally told by my supervisor after the fact

21   that a test came back negative.   As far as what test was run,

22   I don't know.

23     Q.   And when you spoke with your lawyer, he didn't tell

24   you that?

25         MR. BUTLER:   Objection.   Do not answer that question.

42

1      **A.   As far as?**

2      Q.   Well, he was -- at the time, he had already -- were

3      you there when the field test was performed?

4      **A.   Yes.**

5      Q.   And, at the time, was he arrested?

6      **A.   He was in our custody from the time that the canine**

7      **alerted at the checkpoint.**

8      Q.   Right.

9      **A.   He was advised of his rights.**

10     Q.   Right.

11     **A.   So, by definition, he's seized, he's arrested, yes.**

12     Q.   Well, he's seized, but you have no evidence yet,

13     right?

14            MR. BUTLER:   Object to form.

15     **A.   We had the probable cause based on the canine alert**

16     **and the intelligence that we had.**

17     Q.   (By Mr. Romo)   Right.   You had no drugs found?

18     **A.   At that point, no.**

19     Q.   At some point, a field test was performed, correct?

20     **A.   That's correct.**

21     Q.   And at that time, the field test turned out what?

22     **A.   It was positive.**

23     Q.   For what?

24     **A.   Methamphetamines.**

25     Q.   And those were in the windshield wiper liquid, right?

43

1      A.   They were in the container where windshield wiper

2   fluid is normally contained, correct.

3      Q.   And at that point what happened to my client?

4      A.   He was arrested.

5      Q.   That's what I asked you.

6           So at that point he is arrested.  And do you know

7   what happened to him after he was arrested?

8      A.   At some point he was turned over to another agency,

9   and I believe he was transported to Phoenix.

10      Q.   And do you know if he was taken to a jail?

11      A.   I do not.

12      Q.   Okay.  Now, my question that I had before is, do you

13   have a way to correct the E3 information?

14      A.   As far as?

15      Q.   If you make a mistake.

16      A.   Sure.

17      Q.   What is the way?

18      A.   You go in and you edit.

19      Q.   You add it --

20      A.   Correct.

21      Q.   -- is that what you said?  You add information to the

22   original E3, supplement information?

23      A.   I did not say "add," no.

24      Q.   Oh.  What did you say?  I'm sorry.

25      A.   You asked me if something could be corrected, and I

44

1    said, yes, it could be corrected via an edit.

2        Q.  You edit information.  Okay.

3            So you go back to the E3 original information and

4    then you correct the information with the new information by

5    editing the original information?

6        A.  That's a very blanket statement.  I'm -- you're going

7    to have to be more specific than that.

8        Q.  Well, I'm trying to be very specific.  If -- and I

9    know that you disagree with me, you think that my client still

10   was carrying drugs, but if you found out that indeed he was

11   not carrying drugs --

12       A.  Um-hum.

13       Q.  -- okay, and you wanted to correct the E3, how do

14   you -- how would you do it?

15       A.  We would not correct it.  There's nothing --

16       Q.  You would not correct it?

17       A.  There's nothing to correct.  The individual was

18   arrested and apprehended, and that's what it's a record of,

19   and then there's a narrative explaining the probable cause

20   behind that and what was done, and then it shows that the

21   individual was put up for charges and that the charges are

22   either accepted or not.

23       Q.  Okay.

24       A.  There would not be anything to correct, other than if

25   the charges were dropped.

49

1         MR. BUTLER:   -- foundation.  Go ahead and answer.

2      A.  You always read the directions.

3      Q.  (By Mr. Romo)  All right.  And then?

4      A.  The test came back positive.

5      Q.  All right.  And then?

6      A.  At that point, we notified our supervisor that the

7   kit came back positive, and he was -- the driver was placed

8   under arrest.

9      Q.  Okay.  Did you go and tell Casillas, or somebody else

10  did?

11     A.  Mendez and I both, I believe, went over and notified

12  him.

13     Q.  Where was he?

14     A.  I'm sorry?

15     Q.  Where was Casillas.

16     A.  He was in the processing building.  I don't remember

17  if he was in the interview room or not.

18     Q.  And after that, what did you do?

19     A.  What did I do?  I'm trying to remember now.  From

20  that point on, I was -- I was in a support role only.

21  Usually, as a team, we read over the reports as they were

22  completed, helped do typographical editing, made sure that the

23  individual appropriately articulated his case, and we all

24  stayed together to make sure that those individuals were able

25  to finish their reports.

52

1      Q.   Okay.  Who has access to the E3?

2      **A.   Generally, every border patrol agent.**

3      Q.   To get specific information, you have to put in the

4   name and the date and things like that, right, otherwise there

5   is --

6      **A.   So, you would have to do a query either for a case**

7   **number or for a subject, yes.**

8      Q.   Date of birth or whatever, right?  But every border

9   patrol agent has access to that?

10     **A.   I can't speak for every border patrol agent, but they**

11  **should.**

12     Q.   If you want to edit the E3, what do you have to do?

13  Do you have to have permission from someone?

14          MR. BUTLER:  Objection, foundation.

15     **A.   Depends on --**

16          MR. BUTLER:  You can answer.

17     **A.   It depends on what you're trying to edit.  Editing**

18  **has a lot of different meanings here.**

19     Q.   (By Mr. Romo)  Like add information or, I suppose,

20  taking information out.

21     **A.   Do you need permission?  No.**

22     Q.   All right.  So every border patrol agent has access

23  and can do this?

24     **A.   Can do what?**

25     Q.   Editing.

53

1      A.   There are limits, based on your position.  So,

2   supervisors and above have more editing privileges than

3   agents, but, yes.

4      Q.   Does anyone other than border patrol, any other

5   agency, have access to E3?

6      A.   I don't know.

7      Q.   Do you know if more than one field test was

8   conducted?

9      A.   Yes.

10     Q.   How many?

11     A.   I know of at least two.

12     Q.   Do you know if anyone else conducted a field test?

13     A.   A field test, no, I don't know if anybody did or not.

14     Q.   Do you have a good recollection of the two field

15   tests?

16     A.   "Good" is qualitative, but if you're going to ask me

17   questions related to both, go ahead.

18     Q.   Do you have a good memory of it?

19     A.   Again, "good" is qualitative.  What do you want to

20   ask me about the two tests?

21     Q.   I want to ask you if you remember them.

22     A.   Yeah, I believe I do.

23     Q.   So he does one field test?

24     A.   Um-hum.

25     Q.   It turns out positive.  What does he do then?

54

1       A.   So, the first field test that he did was negative, to

2   my recollection.

3       Q.   Okay.   And then what does he do?

4       A.   At that point, we believed it was liquid

5   methamphetamine.

6       Q.   Why?   Why do you believe that?

7       A.   Because we had narrowed down to that particular

8   container, that that's where it was.

9       Q.   But when you narrowed down, it was only you and not

10  the dog, right?   By "you," I mean you and Mendez and whoever

11  else was there.

12      A.   So, I can't speak to the training of a canine.   I

13  know that the canine alerted to the vehicle.   Where he alerted

14  to, I don't know.

15      Q.   Okay.

16      A.   Mendez and I then discussed the situation and said

17  that Mendez recalled from his training that liquid

18  methamphetamine is heavier than water, and so that the next

19  test should probably be taken from the bottom of the tank, of

20  the washer fluid tank, and not from the top.   Initially he

21  took it from the top.   And when he scooped out from the bottom

22  and tested that, that came back positive.

23      Q.   Well, let's go back.   So you narrowed down the area

24  to that container, the fluid container?

25      A.   Um-hum.

55

1      Q.   He, as you said, does the test very carefully, and it

2   turns out negative?

3      **A.   Correct.**

4      Q.   So then you believed, you and Mendez and whoever else

5   was there, that there was methamphetamine there?

6      **A.   Correct.**

7      Q.   What gave you that conclusion, that belief?

8      **A.   If I recall, the initial intel stated that the method**

9   **being utilized was to transport liquid methamphetamine in the**

10  **vehicles.**

11     Q.   Well, you're the first person to tell us that.

12     **A.   First person what?**

13     Q.   That tells us that, from the team.  They all said it

14  was drugs, but they didn't know what kind of drugs.

15          So is your recollection good, or you are now

16  guessing?

17     **A.   Again, "good" is qualitative.  I remember at the time**

18  **that we had specific intelligence that said that there were**

19  **vehicles that were coming through our checkpoint that had**

20  **liquid methamphetamine in them.**

21     Q.   Was there more than one vehicle?

22     **A.   When?**

23     Q.   You said there were vehicles coming in that had

24  liquid meth in them.

25     **A.   Yeah, we had intelligence that, over time, there had**

56

1    been vehicles that had come to the checkpoint with liquid

2    methamphetamine in them.

3         Q.   And do you know where the liquid was being carried?

4         A.   At the time, we had some information that they might

5    have been going to a mall in Phoenix, that the vehicle would

6    be dropped off, and from there someone would come and pick up

7    the narcotics.

8         Q.   All right.  But you had no idea what area of the

9    vehicle the meth was in?

10        A.   I don't recall that we had a specific modus operandi,

11   no.

12        Q.   Okay.  So, you and Mendez discussed this information,

13   said, well, there's meth here, I mean, that's what they told

14   us, and the dog hit.  So the question is, was the test wrong?

15   Is that -- is that what was going on between you two?

16             MR. BUTLER:  Objection, form.

17        A.   So, after the first test, we still believed, based on

18   what we saw in the container, based on his training, and based

19   on that intelligence that we had received, that there was the

20   possibility that there may still be liquid meth in there.  And

21   at that point, that was when he realized that in his training,

22   or least from what he told me, that his training said that

23   liquid meth is heavier than water, and so it was better to

24   test at the bottom of the container than from the top.

25        Q.   (By Mr. Romo)  And he did that?

57

1     A.   Yes.

2     Q.   And so he tested from the bottom, comes up positive?

3     A.   If that's a question, yes.

4     Q.   And that was very quick?

5     A.   What was?   The indication?

6     Q.   Yes.

7     A.   I don't remember the timeframe.

8     Q.   Well, are you familiar with the test?   I mean, does

9   it take a long time for the test to say, oh, this test is

10   negative, this test is positive?

11     A.   So, there are different tests for different types of

12   narcotics.

13     Q.   This is for meth.

14     A.   Okay.   I understand that.   I'm answering your

15   question.

16          There are different tests for different types of

17   narcotics.   Each one has a different set of instructions and

18   has a different method by which you utilize the test in order

19   to make the determination from the test, the chemical

20   reaction.

21          I don't recall, this particular test, what exactly

22   the instructions are.   That's why we rely on the box and we

23   rely on the test.

24     Q.   Okay.   So, you don't remember how long it takes.

25   That's the bottom line.

59

1       **A.   No.   They're inside the kit.**

2       Q.   Inside the kit.  So you break them, and the liquid

3    automatically comes out, and it's added to the original test

4    substance?

5       **A.   Correct.**

6       Q.   See, now I understand a little better.

7            Now you have a positive and you have a negative at

8    this point?

9       **A.   Correct.**

10      Q.   Did you do a third test?

11      **A.   Not that I recall.**

12      Q.   And when you advised Casillas, did you tell him we

13   had a negative and a positive?

14           MR. BUTLER:  Objection, form.

15      **A.   Yes.**

16           MR. BUTLER:  You can go ahead and answer.

17      **A.   Yes.   Yes.**

18      Q.   (By Mr. Romo)  So he knew.

19           MR. BUTLER:  Objection, form and foundation.

20      **A.   I believe he did, yeah.   I recall telling him.**

21           MR. ROMO:  I think that's it.

22                        EXAMINATION

23    BY MR. BUTLER:

24      Q.   Okay.  I just have a few questions to sort of clear

25   up this location of the test kit.  Now, you had indicated that