**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Armando Nieves Martinez, et al., | No. CV 13-955 TUC CKJ (LAB) |
| Plaintiffs, | **REPORT AND RECOMMENDATION** |
| vs. | |
| United States of America, | |
| Defendant. | |

Pending before the court is a motion for summary judgment filed by the defendant on May 17, 2017. (Doc. 127) The plaintiff filed a response on July 28, 2017. (Doc. 139); (Doc. 140). The defendant filed a reply on August 22, 2017. (Doc. 143); (Doc. 144)

The plaintiff, Armando Nieves Martinez, claims he was illegally seized at a vehicle checkpoint and then browbeaten into falsely confessing to drug smuggling by agents of the Department of Customs and Border Protection. (Doc. 20) He and members of his family bring this action pursuant to the Federal Tort Claims Act (FTCA). *Id*. The defendant moves that this court dismiss the action pursuant to Rule 56, FED.R.CIV.P. (Doc. 127) The defendant argues primarily that the agents' actions fall within the discretionary function exception to the FTCA, which provides a limited waiver of the government's sovereign immunity to suit. *Id*.

The case has been referred to Magistrate Judge Bowman for report and recommendation pursuant to the Local Rules of Practice. LRCiv 72.1. A hearing on the motion was held on October 4, 2017. (Doc. 149)

The court recommends that the District Court, after its independent review of the record, deny the motion. The plaintiffs' claims are based on actions taken by the agents that do not fall within the discretionary function exception.

There are material facts in genuine dispute; the movant is not entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(a).

Standard of Review: Summary Judgment

Summary judgment is available only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986).

The initial burden rests on the moving party to point out the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986). "Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010).

Once initially satisfied, the burden shifts to the nonmovant to demonstrate through the production of probative evidence that an issue of fact remains to be tried. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553. "If a reasonable jury viewing the summary judgment record could find by a preponderance of the evidence that [the plaintiffs are] entitled to a verdict in [their] favor, then summary judgment [is] inappropriate; conversely, if a reasonable jury could not find liability, then summary judgment [is] correct. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1027-28 (9th Cir. 2006).

1 "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "Rather, it draws all inferences in the light most favorable to the nonmoving party." *Id.*

FACTUAL AND PROCEDURAL BACKGROUND[1]

On August 18, 2011, the plaintiff, Armando Nieves Martinez, his wife, and two children drove north from their home in Caborca, Sonora into Arizona intending to do some shopping. (Doc. 139-1, p. 1) Nieves is a grape farmer. *Id.* His annual gross income is around three million dollars. *Id.*

Prior to the trip, Nieves's vehicle had been in the repair shop for about ten days. (Doc. 139-1, p. 2) Nieves's wife had been in an accident, and part of the front end had been damaged. *Id.*

The family encountered two checkpoints on their trip northwards. (Doc. 139-1, p. 2) They passed the first without incident, as far as they knew, and proceeded north toward the second. *Id.*

In fact, the Disrupt Unit of the U.S. Border Patrol had been tipped to expect a vehicle coming north smuggling drugs. (Doc. 139-1, p. 7) As it turned out, Nieves's car fit the description of the suspect vehicle. *Id.*, p. 8  Personnel at the first checkpoint notified Agent Casillas, of the Disrupt Unit, that a vehicle fitting the suspect description passed the first checkpoint. *Id.*, p. 9  The vehicle was permitted to proceed on to the second checkpoint because the first checkpoint had no K9. *Id.*, p. 9

Agent Casillas notified agents at the second checkpoint that they were expecting a vehicle smuggling hard narcotics in a hidden compartment. (Doc. 139-1, p. 8)  Casillas insists that a description of the vehicle was not disclosed outside the Disrupt Unit to ensure the

---

[1] Some of the facts are disputed, but the court recites them in the light most favorable to the nonmovant, as it must on a motion for summary judgment. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

impartiality of the agents at the checkpoint, but someone gave a description of the vehicle to Agent Roden, the K9 Agent. *Id*., pp. 8, 9

Agent Roden saw the vehicle he was waiting for and "ran the dog." (Doc. 139-1, p. 9) According to Roden, the dog "alerted" to the front grill area of the vehicle. *Id*. Because of the alert, Roden instructed Agent Roman to send the vehicle to the secondary inspection area. *Id*. If the dog had not alerted, he would have let the vehicle go. *Id*.

The Nieveses were removed from the vehicle, and Roden again conducted an exterior sniff of the vehicle. (Doc. 139-1, p. 10) He obtained the same results. *Id*.

The Nieveses' expert witness, Edward Dobbertin, Jr., opined that the "detection canine team's search of the plaintiff's vehicle was not complete, thorough or within established and acceptable canine training, handling, utilization and/or practices or procedures and techniques . . . ." (Doc. 139-1, p. 11) Dobbertin opined that the dog in this case "sniffed and had indicators," but did not give a full alert. *Id*. A "sniff" occurs when a dog's posture changes, its breathing changes, and it gives "a head shot." *Id*., p. 12 The term "alert" is used when a dog gets as close as possible to the source of the odor and then sits or lies down. *Id*. To conduct a proper search, the dog should have been given a chance to determine where the odor was coming from by letting the dog "search the wheel wells, underneath the vehicle, on top of the doors, the hood, the grill, and then back away from the vehicle" to get into a position to catch odors that are settling down. *Id*. If the source of the odor is not found, the odor could come from contact transfer or even from another vehicle. *Id*.

The Nieveses were brought to the Ajo Border Patrol station. (Doc. 139-1, p. 14) The vehicle was taken to the garage. *Id*. Agent Roden asked Agent Garcia Mendez to assist with the search. *Id*., p. 16 Mendez was a member of the Disrupt Unit. *Id*., p. 17 Mendez checked the windshield wiper container because he had been taught in the recent Desert Snow training session that drugs could be hidden there. *Id*., p. 17 The fluid looked cloudy, which Mendez believed was an indication of narcotics. *Id*. He tested the fluid with Agent Watson. *Id*.

Watson had a tool kit, which was only provided to K9 handlers. (Doc. 139-1, p. 18) Mendez took a wooden rod, or stick, from Watson's kit, wrapped a piece of paper towel around the end of the stick, and dipped it in the liquid. *Id*. He removed the paper and allowed it to dry on a metal bench that he cleaned with an unknown spray solvent. *Id*., pp. 18, 21 He said he did two tests and "from my recollection, I recall both being positive." *Id*., pp. 18-19

Mendez acknowledged that the drug kit instructions state that, "the choice of towel is critical. Unscented, uncolored filtered paper is ideal. Never use brown paper, hand towels or newspapers." (Doc. 139-1, p. 21)

Agent Devin Reno stated that the first test was negative, but the test was performed again sampling liquid at the bottom of the tank. (Doc. 139-1, p. 19) The second test was positive. *Id*. Reno advised Casillas that one test was negative and one was positive. *Id*.

Mendez acknowledged that the instructions for the field test kit state that test U must be performed after test A to ensure that the substance is methamphetamine. (Doc. 139-1, p. 23) Mendez did not know if he had done the U test. *Id*. He could provide no evidence that he did so. *Id*., p. 24 There is photographic evidence that tests A, B, and C or G were performed. *Id*., p. 26

Mendez explained that he was trained to use the test kits at the Academy in 2008-2009, two or three years ago. (Doc. 139-1, p. 23) He had a proficiency test at that time, but not since then. *Id*.

The Nieveses' expert witness, Dr. Leo Kadehjuan, opined that the results obtained by Mendez "do not support a presumption of methamphetamine being in the windshield washer fluid. . . ." (Doc. 139-1, p. 25) He believes that test A was not performed in accordance with the manufacturer's specifications and there is no evidence that test U was performed at all. *Id*., pp. 25, 26, 31, 32 "In order for these tests to have scientific weight, they need to be performed according to the manufacturer's instructions . . . ." *Id*.

Nieves was separated from his family and placed in handcuffs. (Doc. 139-1, p. 2) An agent named Victor shouted at him accusing him and all Mexicans of being drug traffickers. *Id*., p. 3 Nieves believed he was going to be physically attacked by Victor. *Id*.

Nieves was then transported to a windowless cell for about two hours. (Doc. 139-1, p. 3) Victor came in and out of the cell shouting and using foul language. *Id*. He stated that drugs had been seen in the car with X-rays. *Id*. Victor demanded a confession stating five or six times, "Your family's going to go to prison. We're going to take your wife to a prison in Kentucky. We're going to put your son in a federal prison. And your daughter, the U.S. government is going to take charge of her. And we're going to give you from 15 to 30 years of prison." *Id*., p. 3

Nieves's son, 18-year-old Armando, Jr., told Nieves that Victor made the same threats to him. *Id*., p. 4 Armando, Jr., was also afraid that Victor was going to hit him. *Id*. Victor told Armand, Jr., that he should tell his father to have the "balls" to take responsibility. *Id*. Victor took Armando, Jr., to his father's cell once or twice. *Id*.

Nieves was taken to a second cell and was told that methamphetamine was found in the windshield wiper container. *Id*. Nieves asked to speak to his wife. *Id*. Eventually, Victor agreed to their meeting. *Id*., p. 5

Nieves's wife told him that she had received the same threats. *Id*. She and her daughter had been questioned by a female agent who made derogatory statements about the family. *Id*.

Nieves and his wife decided that he should offer a false confession. *Id*. He told Victor, "Okay, I will be the responsible party here in this and just so you can set my family free and prevent them from going to prison." *Id*. The family was released and Nieves was transported to Phoenix. *Id*., p. 6

Victor and a driver transported Nieves to Phoenix by car (Doc. 139-1, p. 6) During the drive, Victor and the driver stated that they needed additional information. *Id*. Nieves stated that he had no information and that he offered a false confession to save his family. *Id*. Victor told Nieves that if he did not provide additional information his family would be brought back to the Ajo station. The driver screamed in English that if Nieves did not provide the information, his "fucking family is going to prison." *Id*.

Nieves then added details to his statement such as the amount of money to be paid and the location of the drop off place. *Id*., p. 6-7  Nieves told Victor about six times that the information was false. *Id*., p. 7

The Nieveses' expert witness, Dr. Richard A. Leo, explained how an innocent suspect could give a false confession based on how the interrogation was conducted. (Doc. 139-1, pp. 32-35)  He opined that Nieves's false confession would be explained by his description of how he was isolated and browbeaten by the agents. (Doc. 139-1, p. 34)  He further opined that the agents "should have had a suspicion that this was likely a false confession" if they were aware of how the investigation and interrogation had been conducted. *Id*., p. 37

The windshield washer fluid was subsequently sent to a proper DEA laboratory. (Doc. 139-1, p. 43)  On September 22, 2011, Kathryn Stevens, a DEA forensic chemist, informed Agent Derryberry that there were no drugs in the fluid. *Id*.  Derryberry ordered a re-inspection of the vehicle. *Id*.  The vehicle was searched with a K9, fiber optic scopes, and additional tools. *Id*.  No drugs were found. *Id*.  Nieves and the vehicle were released on October 14, 2011. *Id*.

Nieves and his family subsequently brought this action pursuant to the Federal Tort Claims Act. (Doc. 1)  They filed an amended complaint on August 19, 2014. (Doc. 20)  They claim causes of action for assault, intentional infliction of emotional distress, negligence and gross negligence, and false imprisonment. (Doc. 20)

On May 17, 2017, the government filed the pending motion for summary judgment. (Doc. 127)  It argues mainly that the plaintiffs' claims are based on actions subject to the FTCA's discretionary function exception and therefore the court lacks subject matter jurisdiction.  They further argue there is no evidence to support the plaintiffs' assault claim.

The plaintiffs filed a response, and the government filed a reply.


<u>The Federal Tort Claims Act</u>

The Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671, et seq., "provides a limited waiver of the sovereign immunity of the United States for torts committed by federal

1  employees acting within the scope of their employment." *Nurse v. United States*, 226 F.3d 996,
2  1000 (9th Cir. 2000). The government accepts liability "under circumstances where the United
3  States, if a private person, would be liable to the claimant in accordance with the law of the
4  place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

A claim brought pursuant to the FTCA, however, may not be based on "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This provision is known as the "discretionary function exception." It is the government's burden to prove that the exception applies. *Gonzalez v. U.S.*, 814 F.3d 1022, 1027 (9th Cir. 2016).

"In order to determine whether the discretionary function exception applies, the court must engage in a two-step inquiry." *Nurse v. United States*, 226 F.3d 996, 1001 (9th Cir. 2000). "First, the court must determine whether the challenged conduct involves an element of judgment or choice." *Id.* "Second, if the conduct involves some element of choice, the court must determine whether the conduct implements social, economic or political policy considerations." *Id.* This is the type of conduct that the discretionary function exception was designed to shield.

The discretionary function exemption prevents "judicial 'second-guessing' of legislative and administrative decisions grounded in public policy." *Nurse*, 226 F.3d at 1001 (internal punctuation removed). "When a statute or regulation allows a federal agent to act with discretion, there is a 'strong presumption' that the authorized act is based on an underlying policy decision." *Id.* (*citing United States v. Gaubert*, 499 U.S. 315, 324, 111 S.Ct. 1267, 1274 (1991)). "[T]he challenged decision need not actually be grounded in policy considerations so long as it is, by its nature, susceptible to a policy analysis." *Id.* (internal punctuation removed). "The determination of whether given conduct falls within the discretionary function exception must focus on the nature of the conduct, rather than the status of the actor." *Id.* (internal punctuation removed).

DISCUSSION

The government argues that the plaintiffs' claims fail due to the discretionary function exception to the limited waiver of sovereign immunity granted by the Federal Tort Claims Act. (Doc. 127) The court finds that the plaintiffs' claims turn on actions that do not fall within the exception. Accordingly, the court concludes that the motion should be denied.

The government maintains that the agents' actions were discretionary and subject to the exception, and it is correct up to a point. The conduct of a criminal investigation is ordinarily a matter of discretion. *See Casillas v. United States*, 2009 WL 735193, at *12 (D. Ariz. 2009), report and recommendation adopted, 2009 WL 735188 (D. Ariz. 2009) ("Generally, judicial review of alleged negligent investigation by law enforcement is foreclosed by the discretionary function exception.") And, this case is no exception. The agents' decision to send the Nieveses' vehicle to the second checkpoint was discretionary. At the second checkpoint, the agents' decision to use the K9 was also discretionary, likewise the decision to field test the windshield wiper fluid for the presence of drugs. However, once these decisions were made, the agents were not at liberty to conduct these procedures in a negligent or slipshod manner. *See, e.g., Indian Towing Co. v. United States*, 350 U.S. 61, 69, 76 S. Ct. 122, 126-27 (1955) ("The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order . . . ."); *Cestonaro v. United States*, 211 F.3d 749, 757 (3rd Cir. 2000) ("Even if there was protected discretion for the National Park Service's decision to maintain parking at the Hospital Street lot, that does not answer whether subsequent decisions were also protected."); *Patel v. United States*, 806 F. Supp. 873, 878 (N.D. Cal. 1992) ("The DEA's decisions to investigate the alleged illegal activity, to obtain the search warrant, when and where to serve the warrant, and to use the MERGE unit personnel to execute the warrant are of the sort that are based on public policy considerations. However, the officers' decisions to use flammable tear gas projectiles (instead of non-flammable projectiles) in an amount sufficient

to completely destroy the structure at the scene were not based on considerations rooted in social, economic or political policy.").

A K9 "alert" ordinarily constitutes probable cause to search a vehicle. *See Florida v. Harris*, 568 U.S. 237, 247, 133 S. Ct. 1050, 1057-58 (2013). That rule, however, assumes that the K9 investigation was performed in a manner calculated to ensure that the alert was reliable. *Id.* The K9 handler in this case was aware of the consequences of a positive alert and was obligated to use due care in his performance of that investigation. A reasonable trier of fact, however, could conclude that the K9 search in this case was not performed with the appropriate care.

Drawing all inferences in the light most favorable to the plaintiffs, a reasonable trier of fact could conclude that there were no drugs in the vehicle. The K9's "alert" therefore was a false positive probably due to the negligent handling of the dog. The handler should have permitted the dog an opportunity to find the source of the scent that caused the dog to "sniff." If he had done so, the dog probably would have failed to make a complete "alert," and the agents would have realized that the vehicle contained no drugs. The agent's decision to stop the investigation after the dog signaled a "sniff" is not the type of decision that "implements social, economic or political policy considerations." *See Nurse v. United States*, 226 F.3d 996, 1001 (9th Cir. 2000).

The agents' decision to field test the windshield washer fluid for drugs was a discretionary choice. However, having made that choice, the agents were obliged to perform the test in a manner calculated to ensure its accuracy, that is, to follow the instructions on the kit. A reasonable trier of fact could conclude that the agents did not do that. A reasonable trier of fact could find that the agents failed to perform the test in accordance with the kit's instructions, in particular, they failed to perform the U test, without which, the test had no scientific value. Presumably, if the agents had performed the field test in accordance with the instructions, the test would have shown that there were no methamphetamines in the windshield

- 10 -

washer fluid. The agents' decision to ignore the kit's instructions was not the type of policy choice shielded by the discretionary function exception.

The agents' conduct during the interrogations contains a similar mix of discretionary and non-discretionary choices. Certainly the decision to interrogate the Nieveses is one subject to policy considerations. But having decided to interrogate them, the agents should have conducted those interrogations in a way calculated to ensure that the confessions secured were reliable. Here, a reasonable trier of fact could conclude that there were no drugs in the vehicle and therefore Nieves's confession was false. One could further conclude, based on the plaintiffs' expert's testimony, that Nieves offered this false confession because the agents employed techniques that run the unnecessary risk of eliciting a false confession. Their decision to use these techniques was not the type of decision that "implements social, economic or political policy considerations." *See Nurse v. United States*, 226 F.3d 996, 1001 (9th Cir. 2000).

The court finds that the plaintiffs' claims turn on actions that do not fall within the discretionary function exception: whether the K9 investigation was performed with the appropriate due care, whether the windshield washer fluid was tested with the appropriate due care, and whether the interrogation was conducted with the appropriate due care. Accordingly, the court finds that the government's motion for summary judgment should be denied.

The government argues in the alternative that the agent's actions were entirely discretionary because "[n]either the federal statute nor the relevant regulations and policies contain a mandatory provision – that is, a provision that 'specifically prescribes a course of action for an employee to follow.'" (Doc. 127, p. 10) (*citing Sabow*, 93 F.3d at 1451). The government highlights an important step in the discretionary function analysis, but this one step is not the entire test.

In *Sabow*, the court of appeals stated that the discretionary function exception does not apply "if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Sabow v. United States*, 93 F.3d 1445, 1451 (9th Cir. 1996). If such a "statute, regulation, or policy" can be identified, then the analysis is complete – the exception

- 11 -

does not apply. If such a directive cannot be found, however, the analysis is not over. Then, the court must go to the second step and consider "whether the judgment is of the kind that the discretionary function exception was designed to shield." *Gonzalez v. U.S.*, 814 F.3d 1022, 1027 (9th Cir. 2016); *see also Cestonaro v. United States*, 211 F.3d 749, 753 (3rd Cir. 2000). Assuming the Nieveses cannot identify a specific "federal statute, regulation or policy" that cabins the discretion of the agents, the court still must decide whether the agents' decisions were the type of decisions that the discretionary function exception was designed to protect. And, as the court explained above, some were, and some were not. Moreover, the plaintiffs *have* identified a specific legal mandate that cabins the agents' discretion – the Constitution.

At oral argument, the government conceded that agents do not have discretion to violate the Constitution, which is what the plaintiffs allege here. *See Castro v. United States*, 608 F.3d 266, 271-72, 275 n.1 (5th Cir. 2010) (Stewart, J. dissenting) (collecting cases) Viewing the evidence in the light most favorable to the non-movant, a reasonable trier of fact could conclude that the agents' investigation was so slipshod that the Nieveses were held without probable cause in violation of their Fourth Amendment[2] rights. And if the Nieveses' Fourth Amendment rights were violated, the agents' actions do not fall within the discretionary function exception. *See Galvin v. Hay*, 374 F.3d 739, 758 (9th Cir. 2004) ("[F]ederal officials do not possess discretion to violate constitutional rights."). Whether or not the agents had probable cause is a genuine issue of material fact. Summary judgment is not appropriate.

The government argues to the contrary that the agents did have probable cause, and the court should grant summary judgment on the false imprisonment claim even if the discretionary function exception does not apply. (Doc. 127, pp. 15-16) The government notes that the K9 alerted, the field test was positive, and Nieves offered a confession.

False imprisonment is "the detention of a person without his consent and without lawful authority." *Cullison v. City of Peoria*, 120 Ariz. 165, 169, 584 P.2d 1156, 1160 (1978).

---

[2] The court does not reach the plaintiffs' argument that the agents' actions also violated their right to due process. (Doc. 139, pp. 13, 34); *but see, Albright v. Oliver*, 510 U.S. 266, 114 S.Ct. 807 (1994).

In this case, one could conclude that the government did have probable cause for the detention if one were to take the evidence in the light most favorable to the government. That, however, is not the rule.

Taking the evidence in the light most favorable to the plaintiffs, a reasonable fact finder could conclude that the government did *not* have probable cause. A K9 alert may provide probable cause but only if the circumstances surrounding the alert are indicative of reliability. Here, a reasonable trier of fact could find the opposite. Similarly, a reasonable fact finder could conclude the drug test was not performed in accordance with the kit's directions and had no scientific value. Finally, a reasonable fact finder could conclude that Nieves's qualified "confession" was of little probative value. A reasonable trier of fact could conclude that the Nieveses were held without lawful authority.

The government further argues that the false imprisonment claim fails because the Magistrate Judge found probable cause to detain Nieves citing to *Haupt v. Dillard*, 17 F.3d 285, 290 (9th Cir. 1994). (Doc. 127, p. 14) The government concedes that *Haupt* does not apply where "the evidence known to the arresting officers is materially different from the evidence presented at the preliminary hearing." (Doc. 127, p. 14) (*citing Wige v. City of Los Angeles*, 713 F.3d 1183, 1185-86 (9th Cir. 2013). Assuming without deciding that *Haupt* and *Wige* apply here, the court finds that a reasonable trier of fact could concluded that the arresting officers had evidence materially different from the evidence presented in Agent Derryberry's affidavit, which apparently was the document upon which the Magistrate Judge found probable cause. (CR 11-1812 PHX DBC, Doc. 1, pp. 2-8) The affidavit states that the K9 "alerted" but does not explain that the handler was predisposed to believe that the vehicle carried drugs and did not allow the K9 to complete the alert. The affidavit states that the windshield wiper fluid tested positive for methamphetamine without stating that the instructions on the test kit were not followed. The affidavit states that Nieves confessed to drug trafficking without stating that Nieves said his confession was untrue and that details in the confession were supplied by the arresting agents.

- 13 -

The government further argues the plaintiffs' claim of intentional infliction of emotional distress fails because the plaintiffs are unable to produce evidence that the agents acted in an extreme or outrageous manner. (Doc. 127, p. 16)

In Arizona, "[t]he tort of intentional infliction of emotional distress requires proof of three elements: [f]irst, the conduct by the defendant must be 'extreme' and 'outrageous'; second, the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct; and third, severe emotional distress must indeed occur as a result of defendant's conduct." *Citizen Publishing Co. v. Miller*, 210 Ariz. 513, 516, 115 P.3d 107, 110 (2005).

Nieves offers evidence that he was browbeaten into offering a false confession by threats to his family, misrepresentation of the evidence against him, and extended periods of isolation and interrogation during which he feared he was going to be beaten. This is sufficient. *See, e.g., Campbell v. Safeway, Inc.*, 332 F. Supp. 2d 1367, 1376 (D. Or. 2004) (Motion for summary judgment on the plaintiff's claim for intentional infliction of emotional distress was denied where the plaintiff offered evidence that she was browbeaten into confessing to stealing $800 on scanty evidence by threats of jail, threats of physical violence, and threats that she would not be home in time to meet her children returning from school.).

The government suggests that the agent's conduct should be seen as less egregious "given the context of an ongoing criminal investigation into a suspected felony." (Doc. 127, p. 16) It is possible that the trier of fact might think so, but the government makes no showing that she *must* do so as a matter of law. It is just as probable, if not more so, that the trier of fact would hold a trained government agent to an even higher standard than a member of the general public.

The government further argues that it is entitled to summary judgment on the Nieveses' assault claim. (Doc. 127, pp. 16-17) "A person commits the tort of assault if he acts with intent to cause another harmful or offensive contact or apprehension thereof, and the other person apprehends imminent contact." *Garcia v. United States*, 826 F.2d 806, 814 n.9 (9th Cir.

1987) (citing Restatement, Second, Torts, § 21). The government argues there is no evidence to support the Nieveses assault claim. The government notes that "[w]ords alone do not make the actor liable for assault." (Doc. 127, p. 17) (citing Restatement, Second, Torts § 31)

Here, however, there is evidence of more than mere words. Nieves presents evidence that he was separated from his family, handcuffed, and placed in the back of a vehicle. (Doc. 139-1, pp. 2-4) Agent Victor was "shouting and accusing him and all Mexicans of being drug traffickers . . . ." (Doc. 139-1, p. 3) Later, Nieves was placed in a windowless cell and subject to continued accusations, shouting, and foul language. *Id.* Nieves states that he believed that Agent Victor was going to strike him. *Id.* A reasonable trier of fact could conclude that Agent Victor displayed animus toward Nieves and then placed him in cell where he would have unfettered access to Nieves, where no one would be able to help him, and where no one would be witness to whatever transpired. Nieves makes out a prima facie claim for assault. The court further notes that Armando Jr. stated he was subject to similar conditions and that he also believed Agent Victor was going to strike him. (Doc. 139-1, p. 4) Armando Jr. "had just been released for neurological treatment for anxiety" and was a "nervous person, hyperactive, scar[ed], afraid." *Id.* This is further evidence in support of the plaintiffs' claim for assault. *See* Restatement, Second, Torts § 27 ("If an act is intended to put another in apprehension of an immediate bodily contact and succeeds in so doing, the actor is subject to liability for an assault although his act would not have put a person of ordinary courage in such apprehension.").

In its reply brief, the government addresses the K9 alert specifically and argues that the plaintiffs' expert opinion does not create a genuine dispute of material fact because his conclusion that the K9 did not properly alert "is based on a misrepresentation of Agent Roden's testimony and is otherwise speculative and lacking in foundation." (Doc. 143, p. 4); *see also* (Doc. 144, p. 2)[3] The court does not agree. The plaintiffs' expert opined that the K9 handler

---

[3] The defendant also objects to the plaintiffs' experts, Dobbertin and Leo, offering an opinion on whether the agents lacked probable cause to hold the Nieveses. (Doc. 144) This court does not rely

- 15 -

failed to allow the dog to complete the alert by finding the source of the smell. His opinion was based on the handler's description of the K9 search in addition to the apparently uncontradicted evidence that the vehicle contained no drugs. The handler, nevertheless, stated that the dog alerted. The expert was entitled to offer an explanation for why a handler would state that the dog alerted on a vehicle that contained no drugs. His conclusion that the handler was negligent based on his training and experience is permissible particularly where, as here, the government offers no alternate explanation.

The government further argues that the plaintiffs are making the same argument that the Ninth Circuit rejected in *U.S. v. Thomas*, 726 F.3d 1086, 1097-98 (9th Cir. 2013). The court does not agree with the government's reading of that case.

In *Thomas*, the defendant argued that if a dog does not complete its alert, than the dog's incomplete alert cannot give rise to probable cause. *U.S. v. Thomas*, 726 F.3d 1086 (9th Cir. 2013). The Ninth Circuit declined to adopt a per se rule that only a complete alert can give rise to probable cause. *Id*. The court held that, "[w]hether a particular dog displays enough signaling behavior [for probable cause] will depend on the facts and circumstances of each case." *Thomas*, 726 F.3d at 1098.

Here, the plaintiffs argue that the facts and circumstances surrounding the K9 investigation indicate that the "sniff" reported by the handler was not a reliable indicator of drugs and that probable cause was not established. The handler had earlier received a tip and expected to find drugs in the vehicle. Consequently, he was predisposed to accept the dog's initial movements as positive proof without completing the alert. The government does not argue that time was of the essence, or that the K9 was desperately needed elsewhere and could not spend any more time with the Nieveses' vehicle. Taking the facts in the light most favorable to the Nieveses, a reasonable trier of fact could conclude that the dog handler was negligent and reached the incorrect conclusion that the vehicle held drugs, when it did not. The

---

on those opinions and therefore does not reach the defendant's evidentiary objections.

plaintiffs' argument is not foreclosed by the holding in *Thomas*. *See U.S. v. Thomas*, 726 F.3d 1086 (9th Cir. 2013).

RECOMMENDATION:

The Magistrate Judge recommends the District Court, after its independent review of the record, enter an order

DENYING the motion for summary judgment filed by the defendant on May 17, 2017. (Doc. 127)

Pursuant to 28 U.S.C. §636 (b), any party may serve and file written objections within 14 days of being served with a copy of this report and recommendation. If objections are not timely filed, the party's right to de novo review may be waived. The Local Rules permit the filing of a response to an objection. They do not permit the filing of a reply to a response without the permission of the District Court.

DATED this 11th day of October, 2017.

_Leslie A. Bowman_
Leslie A. Bowman
United States Magistrate Judge