**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Armando Nieves Martinez, et al., | No. CV-13-00955-TUC-CKJ (LAB) |
| Plaintiffs, | **ORDER** |
| v. | |
| United States of America, | |
| Defendant. | |

This action was brought under the Federal Torts Claims Act, 28 U.S.C. § 2671 against the United States of America for compensatory and consequential damages arising out of United States Border Patrol Agents' alleged actions in connection with a border checkpoint stop, interrogation, and subsequent confinement. At the summary judgement stage, the Court precluded Plaintiffs' claims of negligence, gross negligence, assault, and false imprisonment, but permitted Plaintiffs' claim of intentional infliction of emotional distress to proceed. *See* (Doc. 156).

More specifically, the Court found that Defendant sufficiently demonstrated that the discretionary function exception applied to Border Patrol's actions as a matter of law with respect to Plaintiffs' claims of negligence, gross negligence, assault, and false imprisonment. However, the Court also found that Plaintiffs' claim of intentional infliction of emotional distress presented a genuine issue of material fact and permitted the trial to proceed on that basis. The case came before the Court for a three-day bench trial which commenced on January 28, 2019 and concluded on January 30, 2019. The parties,

respectively, filed Proposed Findings of Fact and Conclusions of Law. (Docs. 198, 199).

*1. Findings of Fact*

Plaintiffs are citizens of Mexico. Plaintiff Armando Nieves Martinez ("Mr. Nieves") is a grape raisin farmer who cultivates, purchases, processes, and packs grape raisins for export to the United States of America. Mr. Nieves is a successful businessman and is married to Amelia Pesquiera Ortega ("Mrs. Nieves"). They have two children: Armando Nieves Pesquiera ("Armando") and Regina Nieves Pesquiera ("Regina"). At the time of the incident, Armando was eighteen years old and Regina was fourteen years old.

On August 18, 2011, the Nieves family planned to go shopping at a mall in Chandler, Arizona. A few days prior to the trip, Mrs. Nieves's car was in an accident and was being repaired at an auto-body shop. On August 17, 2011, Mr. Nieves picked up Mrs. Nieves's car from the shop. That same day, Border Patrol received information that there would be a vehicle containing narcotics that would enter the United States via the Lukeville port of entry on the morning of August 18, 2011. On August 18, 2011 at approximately 8:15 a.m., the Nieves family left Caborca, Sonora, Mexico and arrived at the port of entry in Lukeville, Arizona. From there, the Nieves family traveled north, towards Chandler. There are two common Border Patrol checkpoints between Lukeville and Chandler. The Nieves family was stopped at the first checkpoint where a Border Patrol Agent and a K-9 conducted an inspection of the Nieves family's vehicle. The Nieves family was permitted to continue.

Upon reaching the second checkpoint, Border Patrol agents stopped the Nieves family and requested their visas. One Border Patrol agent and a K-9 conducted an inspection of the Nieves family's vehicle while another inspected the Nieves family's visas. The K-9 alerted to the vehicle twice and the Nieves family was directed to pull their vehicle to a separate area for a secondary inspection. The Nieves family moved their vehicle to a separate area and exited the vehicle. For approximately twenty minutes, Border Patrol agents inspected the Nieves family's vehicle when Border Patrol Agent Victor Casillas ("Agent Casillas") appeared. Agent Casillas was the supervisor of the Disrupt Unit which

conducts criminal investigations in the border region. Agent Casillas is bilingual and was born and raised in Yuma, Arizona. Agent Casillas proceeded to provide Miranda warnings to the adult members of the Nieves family. The adult members of the Nieves family waived their Miranda rights and consented to questioning. Agent Casillas began questioning Mr. Nieves, asking for his name, occupation, and residence and stated that the Nieves family was in trouble because their vehicle had drugs in it. Mr. Nieves was then handcuffed while the rest of the Nieves family was escorted to a trailer. Agent Casillas continued to question Mr. Nieves and placed him in the back of a Border Patrol vehicle.

The Nieves family was then driven to a Border Patrol station in Ajo, Arizona. The trip took approximately thirty to forty minutes. Then, the Nieves family was placed into separate holding cells with Regina placed into the same cell as her mother. Regina and her mother were later allowed to sit in the waiting area of the station. Mr. Nieves was taken to a small office and interrogated. Mr. Nieves testified that Agent Casillas stated that if Mr. Nieves did not tell the truth, Mrs. Nieves would be going to a prison in Kentucky, Armando to a federal prison, and Regina would be placed into the custody of the United States. Mr. Nieves was afraid that he would never see his family again and began to weep. Mr. Nieves characterized the interview as aggressive and abusive.

During this interrogation, Agent Casillas was informed by Border Patrol Agent Francisco Mendez-Garcia that a field test confirmed the presence of liquid methamphetamine in the windshield wiper fluid in the Nieves family vehicle. Agent Casillas then informed Mr. Nieves that Border Patrol Agents "found the drugs." Mr. Nieves testified that Agent Casillas began to laugh and told Mr. Nieves that he was "fucked" and that he was going to spend fifteen years in prison. Agent Casillas again repeated that if Mr. Nieves did not confess, Mrs. Nieves would go to a prison in Kentucky, Armando to a federal prison, and Regina would end up in government custody. Agent Casillas then stated that Mr. Nieves should "have the balls to save [his] family from jail."

At their request, Agent Casillas brought Armando and Mrs. Nieves to Mr. Nieves. Mr. and Mrs. Nieves had a brief discussion about the events that were occurring. They

decided that Mr. Nieves would confess because they no longer wanted the family to remain in custody. Armando and Mr. Nieves also spoke to each other. Mr. Nieves then told Agent Casillas that he would be responsible for what was found in the Nieves family's vehicle. He was handcuffed and placed into a patrol vehicle to be transported to Phoenix, Arizona. During the trip, Agent Casillas further interrogated Mr. Nieves, and according to Mr. Nieves, told him his family would be going to prison if he did not provide more details. Mr. Nieves insisted that he was accepting responsibility solely due to his desire to end his family's confinement. Excluding Mr. Nieves, the Nieves family was released from custody at approximately 6:00 p.m.

Agent Casillas continued to interrogate Mr. Nieves and asked whether the $3,000.00 in his possession was payment for the drugs. Agent Casillas testified that Mr. Nieves gave additional information about the money and about transferring the drugs to a mall in Chandler, Arizona. In response to further questioning by Agent Casillas, Mr. Nieves stated that he could no longer continue telling lies about his acceptance of responsibility. Mr. Nieves repeated that he committed no crimes and if there were drugs in the Nieves family's vehicle, they were not his. After additional questioning, Agent Casillas was dropped off in Buckeye, Arizona and Mr. Nieves was taken to the U.S. Marshal's Office by other agents. Two agents then interrogated Mr. Nieves, who insisted that he was innocent and only confessed because he did not want his family to continue to be detained.

On August 19, 2011, a Criminal Complaint was filed against Mr. Nieves alleging that he knowingly and intentionally conspired to import five hundred grams or more of methamphetamine. On September 23, 2011, the government filed a motion to dismiss that Complaint after additional testing revealed that no narcotics were detected in the samples of the suspected liquid methamphetamine seized by Border Patrol Agents. In total, Mr. Nieves was in custody for forty days.

At trial, the Court heard drastically different accounts from Mr. Nieves and Agent Casillas regarding the tone of the questioning Mr. Nieves was subjected to. The Court finds that Mr. Nieves was genuinely terrified and upset by his encounter with agents. He was

afraid for the wellbeing of his family members, who were detained for hours, as he was questioned. He was told by Agent Casillas that he had drugs in his vehicle and that the field test was positive. After speaking with his wife and son he decided to take the blame so that his family would be released. He confessed to save his family. He admitted this to agents as he was being driven to Phoenix.

*2. Conclusions of Law*

"It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983). Despite the federal government's inherent sovereign immunity, there are limited exceptions. For instance, the Federal Tort Claims Act ("FTCA") "waives the federal government's sovereign immunity for tort claims arising out of the negligent conduct of government employees and agencies in circumstances where the United States, if a private person, would be liable to the claimant under the law of the place where the act or omission occurred." *Bailey v. United States*, 623 F.3d 855, 859 (9th Cir. 2010).

However, that "waiver of immunity is limited . . . by the discretionary function exception, which bars claims 'based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.'" *Blackburn v. United States*, 100 F.3d 1426, 1429 (9th Cir. 1996) (citing 28 U.S.C. § 2680(a)). When an exception to the FTCA applies, there is no waiver of immunity "and courts are without jurisdiction over such claims." *O'Toole v. United States*, 295 F.3d 1029, 1033 (9th Cir. 2002).

To determine whether conduct falls within the discretionary function exception, a two-step analysis is applied. First, the Court must determine "whether the challenged actions were discretionary, or whether they were instead controlled by mandatory statutes or regulations." *United States v. Gaubert*, 499 U.S. 315, 328 (1991). Next, "if an element of choice or judgment is involved, we must move on to the second step of the analysis and determine whether that judgment is of the kind that the discretionary function exception

was designed to shield. The exception protects only governmental actions and decisions based on considerations of public policy. In other words, only those decisions grounded in social, economic, and political policy will be protected by the discretionary function exception." *Blackburn*, 100 F.3d at 1429 (internal citations and quotations omitted).

As the Court previously determined in its July 9, 2018 Order, the discretionary function exception is applicable in this case. Despite Border Patrol's negligent and inaccurate field testing of the suspected liquid methamphetamine, and despite Border Patrol Agents' aggressive interrogation of Mr. Nieves, the discretionary function exception applies. The discretionary function exception is not applicable exclusively to actions that are conducted in a pristine manner. The exception also applies to actions if they are negligent, alarming, or erroneous if they implicate public policy concerns as they do here – protecting the public from drug trafficking. *See e.g.*, *Sabow v. United States*, 93 F.3d 1445, 1454 (9th Cir. 1996), as amended (Sept. 26, 1996) ("Although some of the actions and inactions alleged by the Sabows, if true, represent alarming instances of poor judgment and a general disregard for sound investigative procedure, the investigative agents took discretionary action involving considerations of social and political policy"); *Tsolmon v. United States*, No. CIV.A. H-13-3434, 2015 WL 5093412, at *14 (S.D. Tex. Aug. 28, 2015), aff'd, 841 F.3d 378 (5th Cir. 2016) ("The issue presented, however, is whether the alleged incompetent acts or errors by the CBP agents give rise to actionable claims against the United States under the FTCA. Based on the foregoing, the Court concludes that Plaintiff's claims are barred by the discretionary function exception to the FTCA's waiver of sovereign immunity and are not within the law enforcement proviso waiver of sovereign immunity").

However, there are instances where clearly wrongful actions invalidate the discretionary function exception. In *Sabow v. United States*, James Sabow, a Marine Corps Colonel, was believed to have committed suicide. 93 F.3d at 1449. Sabow's brother, a neurosurgeon, "began to believe that his brother had not committed suicide, but rather may have been the victim of foul play" and began independently investigating the circumstances

of his brother's death, but was dissatisfied with the responses he was receiving and threatened to "go public" with his concerns. *Id.* at 1450. In response, General Wayne Adams, Colonel Sabow's commanding officer, attempted to retaliate by seeking to jeopardize Dr. Sabow's medical license. *Id.* Since these actions were not based on any legitimate policy reasons, the Ninth Circuit held that the discretionary function exception did not apply. *See id.* at 1454 ("General Adams had no legitimate policy rationale for resorting to verbal abuse and an investigation of Dr. Sabow's medical license as a response to the possibility that complaints about the military's investigation into the Sabow death might be publicly aired. Thus, to the extent the Sabows' negligent infliction claim is based on those specific acts, the discretionary function exception does not apply."). *See also Goetz & Sons W. Meat LLC v. United States*, No. C07-00986MJP, 2008 WL 449654, at *3 (W.D. Wash. Feb. 19, 2008) ("In some instances, clearly wrongful actions of government agents may render the discretionary function exception inapplicable."). However, no such exception to the discretionary function exception applies here. Even though Mr. Nieves tendered a confession based upon the false-positive field test, his detention, and Agent Casillas's aggressive questioning, those actions were rooted in a legitimate policy reasons – preventing drug trafficking.

Additionally, the Plaintiffs' claim for intentional infliction of emotional distress also fails. In Arizona[1], the three required elements for a tort of intentional infliction of emotional distress are: (1) conduct by the defendant that is "extreme" and "outrageous"; (2) the "defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct"; and (3) "severe emotional distress must indeed occur as a result of defendant's conduct." *Ford v. Revlon, Inc.*, 153 Ariz. 38, 43 (Ariz. 1987). Not all objectionable conduct rises to the level of "extreme" and

---

[1] Since the actions giving rise to the alleged tort occurred in Arizona, the law of Arizona applies. *See* 28 U.S.C.A. § 1346 ("[T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.").

"outrageous." Only conduct that "go[es] beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community" meets that standard. *Id.*

While the discretionary function exception independently prohibits Plaintiffs' claims, even if the exception was inapplicable, Plaintiffs have introduced no evidence that Border Patrol's actions were "extreme" and "outrageous" or motivated by malicious intent. While the Court can exercise jurisdiction over FTCA claims alleging intentional infliction of emotional distress, it can only do so if the underlying actions were motivated by malice. *See Sheehan v. United States*, 896 F.2d 1168, 1172 (9th Cir.), amended, 917 F.2d 424 (9th Cir. 1990) ("[A] claim based on conduct constituting the tort of intentional infliction of emotional distress is not excluded as a matter of law from FTCA"); *Gasho v. United States*, 39 F.3d 1420, 1434 (9th Cir. 1994) ("We next address whether the arrests of the Gashos can form the basis for an emotional distress claim under the FTCA . . . In short, if the arrests were motivated by malice, the Gashos are entitled to assert a separate tort claim based on the emotional distress resulting from the arrests.").

Plaintiffs presented no evidence that Border Patrol's actions were "extreme," "outrageous," or based upon malicious intent. While Agent Casillas's interrogation methods were aggressive and accusatory, the very purpose of interrogation is to elicit an incriminating response. Trickery and exhortations by law enforcement officers to tell the truth are routinely permitted. *See e.g.*, *Miller v. Fenton*, 796 F.2d 598, 607 (3d Cir. 1986) (law enforcement lie was not "sufficient trickery" to deem a confession involuntary); *United States v. Chalan*, 812 F.2d 1302, 1308 (10th Cir. 1987) (exhortation by law enforcement officers to tell the truth did not render a confession involuntary); *see also Sessions v. Wilson*, 372 F.2d 366, 371 (9th Cir. 1966) ("Every alleged threat or promise of favor made to a prisoner does not call for an evidentiary hearing. Neither common sense nor controlling principles of law indicate such a result.").

In *Avina v. United States*, summary judgment was granted in an FTCA case involving a claim of intentional infliction of emotional distress. There, during a drug raid,

Drug Enforcement Administration agents handcuffed an eleven-year-old girl and pointed a gun at her head "like they were going to shoot [her]." 681 F.3d 1127, 1129 (9th Cir. 2012). The Ninth Circuit reversed the District Court's grant of summary judgment because a trier of fact could find that the DEA agents engaged in "extreme" or "outrageous" conduct. Unlike the DEA agents' actions in *Avina*, Agent Casillas's interrogation, though aggressive, was neither "extreme" nor "outrageous."

Not only was the interrogation based upon a positive, though false, field drug test, it was also predicated upon information received by Border Patrol that a vehicle would be transporting narcotics. Further, a K-9 alerted to the Nieves family vehicle and the aggressive interrogation was of Mr. Nieves and not Mr. Nieves's family members. Mr. Nieves testified that although he was afraid, Border Patrol agents never used physical force, or threatened to use physical force or a weapon. "Extreme" or "outrageous" conduct is restricted only to conduct that is atrocious and intolerable in a civilized community and Plaintiffs failed to provide any evidence that any such "extreme" or "outrageous" conduct occurred during the incident. Notably, Plaintiffs' own expert witness, Dr. Richard Leo, testified at trial that while the incident was a "spectacular mistake," "reckless," and "incompetent," it was "not malicious."

In *Gonzalez v. United States*, the Ninth Circuit considered whether law enforcement's failure to disclose information regarding a potential home invasion that led to two untimely deaths constituted a failure to exercise or perform a discretionary function or duty. 814 F.3d 1022, 1025 (9th Cir. 2016).

Denying the Plaintiff's claim, the Court wrote:

> It is tempting to wonder whether a simple warning to local law enforcement could have prevented the tragic deaths of Gonzalez's husband and daughter. But we are not charged with passing upon the wisdom of the government's exercise of discretion, and the law does not permit us to do so, "whether or not the discretion involved [is] abused." 28 U.S.C. § 2680(a). Choices such as these . . . are among the judgment-laden decisions the discretionary function exception was enacted to shield. We decline to use the tort laws to monitor the executive's exercise of its judgment.

*Id.* at 1037.

Similarly, the Court notes that it is not unsympathetic to the Nieves family. The Nieves family was subjected to hours of detention. Mr. Nieves was interrogated and accused of drug trafficking to which he eventually confessed to save his family. However, the Court also finds that Agent Casillas's actions were not motivated by malice, racial or otherwise. Plaintiffs have failed to meet their burden of proof on their claims and the Court finds in favor of Defendant.

Accordingly, IT IS ORDERED:

1. In accordance with these Findings of Fact and Conclusions of Law, the Clerk of Court is directed to enter Judgment against Plaintiffs and in favor of Defendant.
2. The Clerk of Court shall close its file in this matter.

Dated this 30th day of September, 2019.

_____
Honorable Cindy K. Jorgenson
United States District Judge